Nathan DUNLAP, Defendant–
Appellant/Cross–Appellee

v.

The PEOPLE of the State of Colorado,
Plaintiff–Appellee/Cross–Appellant.

No. 04SA218.

Supreme Court of Colorado,
En Banc.

May 14, 2007.

As Modified on Denial of Rehearing
July 2, 2007.*

* Justice Eid does not participate.

Philip Cherner, Denver, Colorado, Michael Heher, Captain Cook, Hawaii, Attorneys for Defendant–Appellant/Cross–Appellee.

John W. Suthers, Attorney General, Paul Koehler, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Carol Chambers, District Attorney, Eighteenth Judicial District, Paul Wolff, Chief Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellee/Cross–Appellant.

Justice RICE delivered the Opinion of the Court.

This case comes to us on appeal of the district court's denial of the defendant's Crim. P. 35(c) motion for postconviction relief. We reverse in part, affirm in part, and hold that the defendant is not entitled to postconviction relief.

## I. Facts and Procedural History

In 1996, a jury convicted the defendant, Nathan Dunlap, of four counts of first-degree murder for the killing of three teenagers and a middle-aged woman at a Chuck E. Cheese restaurant on December 14, 1993; the jury imposed the death penalty for these crimes. For related non-capital convictions, Dunlap received consecutive terms of incarceration in the Department of Corrections totaling over 100 years. On direct appeal, we affirmed the death penalty. *People v. Dunlap,* 975 P.2d 723 (Colo.1999), *cert. denied,* 528 U.S. 893, 120 S.Ct. 221, 145 L.Ed.2d 186 (1999) (*"Dunlap I"*). The case returned to this court a second time on Dunlap's Crim. P. 35(b) motion to reduce both the death sentence and the non-capital sentences. We affirmed the trial court's denial of that motion. *People v. Dunlap,* 36 P.3d 778 (Colo. 2001), *cert. denied,* 534 U.S. 1095, 122 S.Ct. 844, 151 L.Ed.2d 722 (2002) (*"Dunlap II"*).

Dunlap subsequently filed a Crim. P. 35(c) motion seeking postconviction relief on numerous grounds, including the ineffective assistance of trial counsel. The Crim. P. 35(c) hearing consumed 52 days of court time and was conducted by the same judge who had presided over the guilt and penalty phases of the trial.[1] In its 368–page order, the 35(c)

court determined that Dunlap's trial counsel, Messrs. Forrest Lewis and Steven Gayle,[2] performed deficiently by failing to conduct an adequate mental health mitigation investigation and by failing to object to a portion of the People's penalty phase closing argument. The 35(c) court determined, however, that these two instances of substandard performance did not individually or collectively cause constitutional prejudice. Therefore, the 35(c) court denied postconviction relief.

In the present appeal, Dunlap raises twenty-seven separate issues for review, many of which are claims that he was denied his constitutional right to effective assistance of counsel at both the guilt and penalty phases of the trial. On cross-appeal, the People argue that the 35(c) court erred in finding trial counsel's performance substandard. We agree with the People that the actions of Dunlap's trial counsel did not fall below the constitutionally required level of performance. As such, Dunlap was not denied his constitutional right to effective assistance of counsel and is not entitled to postconviction relief on those grounds. We further find that Dunlap's other contentions of constitutional error are not meritorious. Therefore, we reverse in part and affirm in part the 35(c) court's order, and hold that Dunlap is not entitled to postconviction relief.

## II. Postconviction Review

The right to bring a postconviction attack to the validity and legality of a conviction or sentence is statutory, not constitutional. *People v. Rodriguez,* 914 P.2d 230, 249 (Colo.1996) (*"Rodriguez V"*). In reviewing a Crim. P. 35(c) claim, we presume the validity of the conviction and the defendant bears the burden of proving his claims by a preponderance of the evidence. *Id.; People v. Naranjo,* 840 P.2d 319, 325 (Colo.1992); *Kailey v. Colo. Dept. of Corr.,* 807 P.2d 563, 567 (Colo. 1991). The trial court that presides over a Crim. P. 35(c) hearing is the trier of fact and bears the responsibility of determining the weight and credibility to be given to witness

---

1. For ease of reference, throughout this opinion we use the term "trial court" to refer to the lower court during the guilt and penalty phases of the proceedings, and the term "35(c) court" to refer to the court during the postconviction proceedings.

2. Lewis was lead trial counsel and Gayle served as co-counsel. The 35(c) proceedings primarily focused on Lewis' actions and decisions.

testimony. *Kailey,* 807 P.2d at 567; *Lamb v. People,* 174 Colo. 441, 446, 484 P.2d 798, 800 (1971). Where the evidence in the record supports the findings and holding of the court, the judgment of the court will not be disturbed on review. *Kailey,* 807 P.2d at 567; *Lamb,* 174 Colo. at 446, 484 P.2d at 800.

■ In this 35(c) proceeding Dunlap has raised a number of issues which could have been, but were not, raised on direct appeal. In *Rodriguez V,* we comprehensively addressed whether failure to raise an issue on direct appeal waives that issue for purposes of 35(c) proceedings. 914 P.2d at 252–56. We clarified that, in order for an issue which could have been raised on direct appeal to be reviewable in postconviction proceedings, the issue must be constitutional. *Id.* at 253–55. We also specifically approved and adopted Standard 22–6.1 of the American Bar Association Standards for Criminal Justice: Postconviction Remedies, which sets forth the respondent's affirmative defense of abuse of process.[3] *Id.* at 254 n. 20. The People have not argued abuse of process in response to Dunlap's issues that could have been but were not raised on direct appeal. Therefore, to the extent that Dunlap raises claims of constitutional error, we address the issues on the merits.[4] In so doing, we address the claims using the same standards that would have applied had the issues been raised on direct appeal. *See Rodriguez V,* 914 P.2d at 273 (applying plain error standard to erroneous jury instruction); *id.* at 261 (reviewing

trial court's denial of a challenge for cause for abuse of discretion); *People v. Versteeg,* 165 P.3d 760, 763–65 (Colo.App. 2006) (discussing the correct standard of review for a postconviction claim based on unpreserved trial error).

### III. Ineffective Assistance of Counsel

■ Both the United States and the Colorado Constitutions guarantee a criminal defendant a right to the effective assistance of counsel. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. The United States Supreme Court established the test for the ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Rodriguez V,* 914 P.2d at 294; *Davis v. People,* 871 P.2d 769, 772 (Colo.1994) ("*Davis II*"). In order to prevail on an ineffective assistance of counsel claim, a defendant must prove that 1) counsel's performance was deficient and 2) the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Unless both showings are made, a defendant has not proven that he was denied the effective assistance of counsel. *Id.*

■ For the performance prong, a defendant must prove that counsel's representation "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. In conducting the reasonableness inquiry, a court must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the cir-

---

**3.** Standard 22–6.1 states in relevant part:

(b) Unless barred because of abuse of process, claims advanced in postconviction applications should be decided on their merits, even though they might have been, but were not, fully and finally litigated in the proceedings leading to judgments of conviction.

(c) Where an applicant raises in a postconviction proceeding a factual or legal contention which the defendant deliberately or inexcusably

 (i) failed to raise in the proceeding to judgment of conviction, or,

 (ii) having raised the contention in the court, failed to pursue the matter on appeal, a court may deny relief on the ground of an abuse of process. *Abuse of process should be an affirmative defense to be pleaded by the respondent.* Where a rule or procedure governing conduct of criminal prosecutions requires that specified defenses or objections be pre-

sented at a certain time, and an applicant raises in a postconviction proceeding an issue that might have been but was not presented in a timely manner in the proceeding leading to judgment of conviction, the applicant should be required to show cause for the failure to comply with the rule of procedure. In other instances, the burden of proof of abuse of process should be borne by the respondent. *ABA Standards for Criminal Justice: Postconviction Remedies,* Standard 22–6.1 (2d ed.1986) (emphasis added).

**4.** The current version of Crim. P. 35(c) requires that the court, with a few exceptions, dismiss "any claim that could have been presented in an appeal previously brought or postconviction proceeding previously brought...." Crim. P. 35(c)(3)(VII). Dunlap's 35(c) motion was filed in the lower court prior to the passage of this section, however, and therefore we cannot rely upon it to dismiss his claims.

cumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. In addition, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

For the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Only where both the performance prong and the prejudice prong have been proven will a defendant be entitled to postconviction relief because of the ineffective assistance of counsel.

Both prongs of the ineffectiveness inquiry present mixed questions of law and fact. *Id.* at 698, 104 S.Ct. 2052. When reviewing a postconviction court's findings on a mixed question of law and fact, we defer to the court's findings of fact if they are supported by the record but review legal conclusions de novo. *People v. Kyler,* 991 P.2d 810, 818 (Colo.1999). With these principles of law in mind, we turn to Dunlap's specific claims.

Dunlap alleges that he was denied his constitutional right to the effective assistance of counsel because: 1) trial counsel failed to conduct an adequate mitigation investigation into his mental health; 2) trial counsel operated under a conflict of interest; 3) trial counsel failed to present available mitigation evidence on the issue of future dangerousness; 4) trial counsel's opening statements in both the guilt phase and the penalty phase of the trial denied him effective assistance of counsel; 5) trial counsel's closing argument in the penalty phase of the trial denied him effective assistance of counsel; 6) trial counsel stipulated to evidence of his gang affiliation; and 7) trial counsel failed to exhaust peremptory challenges during jury selection.[5] We address each allegation in turn.

**5.** We address this contention in section IV—Jury Selection, *infra.*

**6.** The transcript of the defense's penalty phase evidence is found in volumes 92–93 of the rec-

### A. Mental Health Mitigation Investigation

Dunlap alleges that trial counsel failed to adequately investigate and present a mental health mitigation case at the penalty phase of his trial. The 35(c) court agreed that trial counsel's decision to stop investigating a mental health defense fell below an objective standard of reasonableness. However, the 35(c) court also determined that the deficient performance was not prejudicial and therefore denied postconviction relief. Dunlap appeals the prejudice holding, while the People cross-appeal the deficiency holding. We agree with the People that trial counsel's performance was not deficient. We also agree with the 35(c) court that, even if the performance was deficient, there is no reasonable probability that in the absence of the deficient performance the outcome would have been different. Hence, we hold that Dunlap was not denied his constitutional right to the effective assistance of counsel.

### 1. Mitigation Case Presented

The defense presented nine witnesses at the penalty phase of Dunlap's trial. The mitigation case focused on Dunlap's age at the time of the crime, his cooperation with the authorities, and his abusive home life. *Dunlap I,* 975 P.2d at 764; §§ 16–11–103(4)(a), (h), (*l* ), 8A C.R.S. (1986 & Supp. 1993). Testimony revealed that Dunlap's mother, Carol Dunlap, had been diagnosed with bipolar disorder. Witnesses testified that Mrs. Dunlap was incredibly controlling and hard on her children, at times yelling at them or hitting them. Testimony established that the Dunlap children were afraid of their mother while growing up. One of Dunlap's former probation officers also testified that Mrs. Dunlap was counterproductive to his efforts to work with and rehabilitate Dunlap. Adenia Dunlap, Dunlap's sister, testified that their stepfather was physically abusive to Dunlap and sexually abusive to her; she further testified that Dunlap knew of the sexual abuse.[6]

ord. Throughout this opinion, citations to the postconviction record are in Roman numerals and citations to the trial record are in Arabic numerals.

## 2. Mental Health Background

While at the Arapahoe County Jail, Dunlap began behaving strangely on the afternoon of February 14, 1994, resulting in a move to the jail's medical unit and eventual transfer to the Colorado Mental Health Institute at Pueblo ("CMHIP") in order to undergo a mental health competency examination. Lewis testified at the 35(c) hearing that after Dunlap's strange behavior began, he greatly feared the possibility of Dunlap being transferred to CMHIP and consequently filed an ex-parte motion for an independent psychiatric evaluation. This motion was denied, and Dunlap was transferred to CMHIP.

Trial counsel eventually succeeded in having an independent psychiatrist appointed, Dr. Robert Fairbairn. Lewis testified that he instructed Dr. Fairbairn to go to CMHIP and observe Dunlap in person for the purpose of helping craft a mental health mitigation case. Dr. Fairbairn's eventual opinion was that 50 percent of the time Dunlap was normal, 40 percent of the time he was malingering symptoms, and 10 to 20 percent of the time he suffered from some sort of psychosis. Dr. Fairbairn did not diagnose a major mental illness.

Dunlap's hospitalization at CMHIP lasted from mid-February until early July, 1994. In the summer of 1994, trial counsel received a report authored by Dr. David Johnson, Dunlap's evaluating physician at CMHIP ("CMHIP report"). At the 35(c) hearing, Lewis described the CMHIP report, along with the accompanying medical records, as "the most consistently damaging and consistently negative and consistently devastating set of reports that I have ever seen." (R. Vol. LX, 72.) Dr. Johnson had concluded Dunlap did not suffer from a major mental illness and further opined that Dunlap's behavior was most likely volitional. Furthermore, the accompanying medical records revealed numerous instances of Dunlap's misbehavior while hospitalized, includ-

ing abusive behavior toward CMHIP staff and other patients. The medical records, along with interviews of CMHIP staff that the People conducted immediately after Dunlap left CMHIP,[7] further revealed that Dunlap made statements regarding the Chuck E. Cheese murders which showed a lack of remorse for the victims.

On April 28, 1995, the defense filed a motion to have the evidence generated at CMHIP excluded at both the guilt and penalty phases of the trial.[8] Following a motions hearing, the trial court ruled on December 13, 1995, that the People could not introduce such evidence in its case-in-chief during either phase, but could use the evidence in rebuttal if the defense opened the door by presenting mental health evidence.

In February 1995, the defense team hired Dr. Rebecca Barkhorn, a psychiatrist. Lewis testified that he hired Dr. Barkhorn as a possible "mitigation expert." He wanted Dr. Barkhorn to get to know Dunlap and the Dunlap family, in the hopes Dr. Barkhorn would learn information that could be helpful to the mitigation case. Lewis was also interested in Dr. Barkhorn's independent assessment of his client's mental health. Lewis testified that he provided Dr. Barkhorn with some background information on Dunlap, but that he did not provide her with the CMHIP records because he wanted her independent assessment of Dunlap. In September 1995, however, Lewis did provide Dr. Barkhorn with Dr. Johnson's CMHIP report and Dr. Frank Lee's report.[9] The underlying medical records and interviews with CMHIP staff were never given to Dr. Barkhorn. The 35(c) court found that Dr. Barkhorn met with Dunlap until December 1995, at which time she informed trial counsel that Dunlap had a narcissistic personality disorder with antisocial traits.

In the 35(c) proceedings, Dunlap argued that trial counsel failed to adequately investi-

7. Defense trial counsel received the notes of these interviews through discovery.

8. The motion was entitled "Motion to Preclude Any Use of Medical or Other Testimony from Officers, Employees, Staff, or Agents of Colorado Mental Health Institute Obtained During the Competency Evaluation Process in this Case." (R. Vol. 3, 932.)

9. Dr. Lee performed a psychological assessment of Dunlap while Dunlap was at CMHIP. Dr. Lee concluded that little in the psychological test results suggested Dunlap was suffering from psychosis. Dr. Lee further noted that Dunlap's behavioral problems appeared to be volitional. Dr. Johnson relied in part on Dr. Lee's testing to reach his conclusions in the CMHIP report.

gate his mental health before determining that a mental health mitigation case would not be viable. Dunlap further maintained that he was suffering from a major mental illness in 1994, specifically bipolar disorder, and that this diagnosis would have been mitigation evidence which would have explained much of his objectionable behavior while at CMHIP. In order to meet his burden of proof, Dunlap called four doctors to testify at the 35(c) hearing: Dr. Charles Opsahl, Dr. Dorothy Otnow Lewis, Dr. Todd Poch, and Dr. Rebecca Barkhorn. The 35(c) court found that of the four defense experts, only Drs. Poch and Barkhorn were substantially credible.[10] Both Dr. Poch and Dr. Barkhorn opined that Dunlap most likely suffered from bipolar disorder at the time of his trial. Dr. Barkhorn's previous diagnosis, which at the time of trial was narcissistic personality disorder with antisocial traits, changed after postconviction counsel provided her with the CMHIP records that she did not have access to in 1995.

### 3. The Performance Prong of the *Strickland* Analysis

■ The 35(c) court determined that Dunlap's mental health mitigation investigation claims were, in part, meritorious. The 35(c) court concluded that trial counsel, particularly Lewis, performed deficiently by deciding not to run a mental health mitigation case without first obtaining an independent, private mental health evaluation. We disagree.

■ Trial counsel in a death penalty case has the duty to investigate potential sources of mitigation evidence for the penalty phase of the trial. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052; *see also ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,* Guideline 11.4.1, 11.8.3 (1989).[11] An unreasonable failure to conduct a mitigation investigation can constitute the grounds for ineffective assistance of counsel. *See, e.g., Wiggins v. Smith,* 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In *Strickland,* the Supreme Court discussed the duty to investigate:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 (emphasis added). Trial counsel acts reasonably for purposes of the *Strickland* performance prong, therefore, by either performing a reasonable investigation or by making a reasonable decision that such investigation is unnecessary. We cannot agree with the 35(c) court that Lewis' decision not to present a mental health mitigation case, and hence the decision not to pursue an additional mental health expert's opinion, was unreasonable.

This is not a case where defense counsel failed to conduct a mitigation investigation altogether, failed to follow-up on an obvious lead, or failed to investigate the prosecution's evidence of aggravation.[12] Quite the oppo-

---

10. In his briefing to this court, Dunlap argues that the 35(c) court erred in making credibility determinations. To the contrary, a defendant bears the burden of proving postconviction allegations by a preponderance of the evidence, and the trial court's job is to assess the credibility and weight of the evidence presented by a defendant to meet that burden. *Kailey,* 807 P.2d at 567. Where the evidence before the trial court supports its findings and holding, the court's judgment will not be disturbed on appeal. *Id.* In this case, the testimonies of Drs. Opsahl and Lewis were called into question through cross-examina-

tion and through other experts who testified at the 35(c) hearing. We cannot say that the 35(c) court's conclusions as to their credibility were unsupported by the record.

11. We cite to the 1989 version of the ABA Guidelines because it was in effect at the time of Dunlap's trial. The ABA released a more recent version in 2003.

12. This case is thus distinguishable from recent Supreme Court cases finding trial counsel constitutionally ineffective for a failure to conduct an

site, the 35(c) court found that the trial defense team began working on the penalty phase immediately after being appointed. Trial counsel hired a private investigator to assist in developing a mitigation case; the investigator and his staff worked from 1994 through the conclusion of trial, including traveling out-of-state to conduct witness interviews, in order to find available mitigating evidence. Trial counsel obtained and investigated Dunlap's school, hospital, and juvenile history records. Trial counsel was also aware that Carol Dunlap, the defendant's mother, had been diagnosed with bipolar disorder and that bipolar disorder can be hereditary. Thus, trial counsel attempted on numerous occasions to obtain her medical and psychiatric records; she refused, however, to sign a waiver that would have given the defense team access to her records.

Furthermore, counsel filed a motion for a private, independent psychiatric examination after Dunlap's behavior changed at the Arapahoe County Jail. This motion was denied, and Dunlap was sent to CMHIP. Trial counsel persisted in efforts to get an independent expert appointed, however, and was successful in retaining Dr. Fairbairn. Dr. Fairbairn traveled to CMHIP and had personal contact with Dunlap, the nurses, and the doctors at the hospital. In the end, however, Dr. Fairbairn's opinion—that Dunlap was 50 percent of the time normal, 40 percent malingering, and 10 to 20 percent suffering from an un-

specified psychosis-was not helpful to the defense.

After Lewis received Dr. Johnson's CMHIP report and the accompanying records, he determined that it was critical the jury not learn about Dunlap's stay at CMHIP.[13] The defense team therefore began focusing the mitigation investigation on Dunlap's home life. In line with the decision to keep the CMHIP material away from the jury, the defense filed a motion to prevent the People from using the evidence generated at CMHIP. While the defense was successful in keeping the CMHIP evidence out of the People's case-in-chief during the guilt and penalty phases of the trial, the trial court ruled that if Dunlap opened the door to mental health issues, the People could introduce the evidence in rebuttal.

This court's own review of the record reveals that trial counsel's decision to limit the mental health mitigation investigation was reasonable in light of the CMHIP material. The record reflects that at CMHIP Dunlap was physically and verbally abusive toward staff, stalked another patient, demeaned mentally ill patients, flashed gang symbols at peers, was incontinent, acted like a chicken, threw food, chewed holes in his mattress, and made repeated statements about the Chuck E. Cheese crimes, including disparaging remarks about the victims.[14] Lewis testified at the 35(c) hearing that he believed Dunlap's lack of remorse and statements about the

adequate mitigation investigation. *See Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins*, 539 U.S. at 524–25, 534–35, 123 S.Ct. 2527; *Williams v. Taylor*, 529 U.S. 362, 395–99, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**13.** At the 35(c) hearing, Lewis described the effect of the CMHIP materials on any mental health defense:

My hope for the mental health part of the investigation was that it could be done independently and privately and confidentially by someone like Fred Miller or Bob Fairbairn or Rebecca Barkhorn, or the list goes on of people that we chose, we could trust, we could control the situations and most importantly that we could look at confidentially and make our strategic decisions of what to do with it.
. . . .
Once the trip to the state hospital occurred and this sea ... of really devastating material

was generated, I felt we had no choice but to steer through the case knowing that that iceberg was there.
And I felt that it probably forever impacted—it had to, it must be considered in any evaluation of the pure mental health category of mitigation.
[T]he report came back not only that there was no Axis I diagnosis, but it came back—from the standpoint of a juror, when I read that report, I tried to look at it as a juror and I saw it not only as a non-Axis-I diagnosis, but I saw it as fairly pervasively stating the case for malingering.
(R. Vol. LX, 58.)

**14.** For example, Dunlap told a registered nurse at CMHIP, with regard to the Chuck E. Cheese murders, that the victims meant nothing to him and he would kill again. (R. Vol. LI, 214; R. Vol. 51, 48.) Dunlap also told Dr. Lee that he believed himself to be a "legend."

crime while at CMHIP "would just be something that even our best juror wouldn't be able to get over...." (R. Vol. LX, 69.)

Dunlap argues that a diagnosis of bipolar disorder, such as the one presented by the defense at the 35(c) hearing, would have explained and neutralized this evidence. In some cases, evidence of the defendant's severe mental health problems is effective mitigation. *See Williams v. Taylor,* 529 U.S. 362, 396–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (evidence that defendant was "borderline mentally retarded" might well have changed the result of sentencing); *Brewer v. Aiken,* 935 F.2d 850, 857–59 (7th Cir.1991) (trial counsel constitutionally ineffective for not investigating the defendant's mental history). In others, however, mental health evidence can have little mitigating effect or even be harmful to the defendant's case. *See Rodriguez V,* 914 P.2d at 297 *(quoting Laws v. Armontrout,* 863 F.2d 1377, 1389 (8th Cir. 1988)); *Cannon v. Gibson,* 259 F.3d 1253, 1277–78 (10th Cir.2001); *Holman v. Gilmore,* 126 F.3d 876, 883 (7th Cir.1997); *Taylor v. Warden,* 905 P.2d 277, 286 (Utah 1995). As the Eighth Circuit wrote in *Laws v. Armontrout,* and we quoted in *Rodriguez V:*

> Counsel could easily have concluded that the decision to present psychological testimony would have disastrous consequences. Skillful cross-examination could have revealed that although [the defendant] suffered from no mental impairment that would negate responsibility for the murders he had committed, he was nonetheless a maladjusted man with a propensity for violence.... Such cross-examination could have alienated the jury against his client.

*Rodriguez V,* 914 P.2d at 297 *(quoting Laws v. Armontrout,* 863 F.2d at 1389).

In this case, while further pursuing and presenting mental health mitigation might have also been a reasonable professional decision, we cannot say the choice not to do so was unreasonable. Presenting a mental health mitigation case would have been risky at best given the substantial amount of damaging evidence from CMHIP that the People had to rebut Dunlap's claims.[15] We decline

to hold that in this case the decision to avoid such risky evidence, and the consequent decision to cut short the mental health investigation, falls below an objective standard of reasonableness. *See Rodriguez V,* 914 P.2d at 297 (counsel's decision not to present evidence of defendant's psychiatric problems because he feared the evidence would do more harm than good was reasonable); *Davis II,* 871 P.2d at 773–74 (counsel's decision not to investigate or present character evidence that was at best a "two-edged sword" was not deficient); *Burger v. Kemp,* 483 U.S. 776, 788–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (counsel's decision to limit the mitigation investigation after determining the evidence could be counter-productive was supported by reasonable professional judgment); *Chandler v. United States,* 218 F.3d 1305, 1321–24 (11th Cir.2000) (finding counsel's failure to investigate character witnesses out of fear of cross-examination and the prosecution's possible rebuttal evidence to be reasonable).

Dunlap next argues that the evidence from CMHIP was actually just cumulative of evidence that was already before the jury and thus there would have been no downside to presenting a mental health defense. The evidence the jury heard included that Dunlap: 1) told numerous friends about his plans for Chuck E. Cheese prior to the crime; 2) confessed committing the crime and described it in graphic detail to more than one person; 3) expressed little remorse for the victims of the crime; 4) told a fellow inmate that he committed the crime because he was fired from Chuck E. Cheese, for "racial" reasons, to see if he could get away with it, and because "it was just business;" 5) wrote letters intimidating witnesses against him and encouraging witnesses to lie; and 6) had a history of gang involvement and armed robberies.

We are not persuaded by Dunlap's argument. The evidence that would have been put forth by the People to rebut a mental health defense not only involved Dunlap's statements about the crime and victims, but also included evidence of Dunlap's misbehav-

---

15. We also note the 35(c) court's factual finding that, at the time of Dunlap's trial, clinicians had limited ability to diagnose bipolar disorder in adolescents and that much has been learned

about bipolar disorder since the trial. This factual finding undermines Dunlap's claim that trial counsel was ineffective for not presenting a diagnosis of bipolar disorder to the sentencing jury.

ior at CMHIP and the near unanimous view of the CMHIP staff and doctors that Dunlap was malingering his symptoms. The 35(c) court found the CMHIP witnesses to be credible, and found that their testimony would have undermined the mitigating value of a mental health defense. Such evidence would not have been cumulative of anything else the jury had heard. Even if trial counsel had acted deficiently here, the evidence before the jury that Dunlap cites amply demonstrates the lack of actual prejudice in this case. *See* Discussion, section III.A.4, *infra.*

Dunlap next argues that trial counsel was ineffective for not providing Dr. Barkhorn with all of the relevant medical records. While we agree that trial counsel should have provided Dr. Barkhorn with all of Dunlap's records, we also find that trial counsel's decision to cut short the mental health investigation was a reasonable professional decision as of the fall of 1994. At that point in time the defense team had received the CMHIP report, had received the People's interviews with CMHIP staff, and had hired Dr. Fairbairn to assess Dunlap's mental health. As we have explained, the decision to cut short the investigation was reasonable in light of these materials. Dr. Barkhorn was not hired until February 1995 and, therefore, trial counsel's conduct with regard to her does not alter our holding under the *Strickland* performance prong.

*Strickland* "does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533, 123 S.Ct. 2527. The defense team had reason to believe that a mental health defense would not only fail to assist Dunlap at sentencing, but could even be harmful. Trial counsel's strategic decision to limit the mental health miti-

gation investigation was made in the face of extraordinarily difficult circumstances.[16] Evaluating the situation from trial counsel's viewpoint at the time, and according great deference to counsel's decision, we find the limited mental health mitigation investigation was supported by reasonable professional judgment. We therefore hold that the 35(c) court erred in finding trial counsel's performance to be deficient, and we reverse that holding.

### 4. Prejudice Prong of the *Strickland* Analysis

Assuming, arguendo, that trial counsel's decision to limit the mental health mitigation investigation fell below an objective standard of reasonableness, we agree with the 35(c) court that Dunlap has not shown that he was actually prejudiced by the deficient performance. To meet the prejudice prong, a defendant must prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The record reveals that there is no reasonable probability a different outcome would have been reached, even if trial counsel had further investigated and presented a mental health mitigation case.

As we found in *Dunlap I*, the facts of this crime were shocking. 975 P.2d at 733–34, 764. Dunlap, after hiding in the Chuck E. Cheese bathroom until closing time, brutally murdered four people, three of whom were teenagers, by shooting them in the head. *Id.* at 733–34. The evidence before the jury included that one of the teenage victims begged for her life before Dunlap shot her, and that Dunlap later told a friend she "went out like a soldier." Id. at 734. Trial also

---

**16.** Lewis' testimony at the 35(c) hearing captures well the challenges he and Gayle faced:

[T]he decisions were extremely difficult for me, beginning with the first one. Do you just run through the mine field, see what happens, or do you really try to sort it out and how do you sort it out. It's the one step forward, two steps back. With us we had so many doors, there were so many doors in this case that could be opened that we knew would undoubtedly be devastating to our client. There were

so many things we had to be careful or so many tightropes we had to walk.

. . . .

Every day, every minute, every witness, every hour you're making those kind of balancings and those kind of decisions, realizing that there is this massive evidence out here, a lot of which we've kept out. And it's still overwhelming . . . it was the most difficult strategic case I could ever imagine that I've ever had or ever will have, could ever imagine.

(R. Vol. LXV, 148–49.)

revealed that on the afternoon of the crime, Dunlap told friends he was intent on committing the murders. *Id.* at 733. The evidence of Dunlap's guilt was simply overwhelming. Id. at 765 ("This is neither a case in which there was a close issue concerning the identity of the murderer, nor a case where new evidence could someday reveal that the wrong person had been charged and convicted.").

In its penalty phase verdict, the jury found that seven statutory aggravating factors, six of which were non-duplicative, had been proven beyond a reasonable doubt for each of the four murder victims. These aggravators were: 1) Dunlap had a prior felony conviction; 2) Dunlap committed the offense while lying in wait or from ambush; 3) Dunlap intentionally caused the death of the victim in the course of an aggravated robbery; 4) Dunlap intentionally caused the death of the victim in the course of a first-degree burglary; 5) the offense was committed for pecuniary gain; 6) in the commission of the offense, Dunlap knowingly created a grave risk of death to Bobby Stephens; and 7) the offense was committed for the purpose of avoiding lawful arrest or prosecution. §§ 16–11–103(5)(b), (f), (g), (h), (i), and (k), 8A C.R.S. (1986 & Supp.1993); *see also Dunlap I,* 975 P.2d at 764.

In addition to evidence pertaining to the statutory aggravators, the People presented aggravating circumstance evidence at the penalty phase.[17] This evidence established Dunlap's violent criminal history, his lack of remorse for his prior crimes, threats he made to the People's witnesses, his attempted escape from jail, and his acquisition while awaiting the Chuck E. Cheese trial of a tattoo depicting a smoking gun and the words "By Any Means Necessary." *Dunlap I,* 975 P.2d at 738, 742.

If trial counsel had acted as Dunlap now suggests and argued that Dunlap suffered from a major mental illness, the People would have presented additional damaging evidence to the jury. We further note that at the 35(c) hearing, although Dr. Barkhorn testified she would have diagnosed Dunlap with bipolar disorder at the time of trial if she had had all the information, she also testified that there is no evidence to suggest Dunlap was mentally impaired the night of the murders.[18] Similar testimony at trial would have diluted the strength of any mental health mitigation evidence.

Given the strength of the evidence against Dunlap at both the guilt and penalty phases of the trial, the likelihood that any errors in counsel's performance prejudiced Dunlap is small. *See Strickland,* 466 U.S. at 696, 104 S.Ct. 2052 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). The evidence Dunlap presented at the 35(c) hearing was not sufficient to undermine our confidence in the outcome of his trial. Hence, there is no reasonable probability a different outcome would have occurred were it not for trial counsel's decision to limit the investigation and presentation of mental health mitigation. *Id.* at 694, 104 S.Ct. 2052. The 35(c) court was correct in finding that Dunlap failed to prove prejudice.

### B. Conflict of Interest

■ Dunlap's next contention of ineffective assistance of counsel centers on Lewis' alleged conflict of interest. For a brief peri-

---

**17.** The People introduced this evidence to rebut mitigating factors not argued by the defense and the trial court allowed the jury to consider the evidence during the eligibility phase of deliberations. *Dunlap I,* 975 P.2d at 739–40. In *Dunlap I,* we held that the trial court acted inappropriately in doing so. *Id.* at 740. However, we also held that the evidence was admissible for the jury's consideration at the fourth step of the decision process, *id.* at 742, and that the trial court's error was harmless beyond a reasonable doubt, *id.* at 742–43. Dunlap argues that this holding announced new law, the retroactive application of which violated due process. This claim lacks merit. In *Dunlap I* we relied on the plain language of the statute as well as preexisting United States Supreme Court precedent in determining that the aggravating circumstance evidence was admissible for the jury's consideration at the fourth step of deliberations. *Dunlap I,* 975 P.2d at 739–41.

**18.** Dr. Dorothy Otnow Lewis, another of Dunlap's experts at the 35(c) hearing, did opine that Dunlap was mentally impaired the night of the murders. The 35(c) court found, however, that "no other testimony ... struck the [c]ourt as being so completely biased and of little value in this case as that of Dr. Lewis." The 35(c) court ascribed no credibility to Dr. Lewis' opinions.

od of time approximately a year and a half prior to the beginning of the Chuck E. Cheese trial, Lewis represented Miguel Kirkpatrick, an important witness for the People, in unrelated criminal matters. Lewis withdrew as Kirkpatrick's counsel after learning that Dunlap and Kirkpatrick had jointly attempted to escape from the Arapahoe County Jail. Dunlap claims Lewis' representation of Kirkpatrick created a non-waivable conflict of interest and that Lewis' continued representation of Dunlap while Lewis was operating under this conflict denied Dunlap the effective assistance of counsel. Dunlap further argues that he was denied the effective assistance of counsel when Lewis gave a letter to Kirkpatrick's attorney that Kirkpatrick had written to Dunlap. We are not persuaded by Dunlap's arguments.

▇▇▇ The constitutional right to the effective assistance of counsel includes the right to conflict-free counsel. *People v. Martinez,* 869 P.2d 519, 524 (Colo.1994). The right to the effective assistance of counsel can therefore be violated by "representation that is intrinsically improper due to a conflict of interest." *People v. Castro,* 657 P.2d 932, 943 (Colo.1983). A conflict of interest can arise where a defense attorney previously represented a prosecution witness because of the duty of confidentiality that survives the termination of an attorney-client relationship. *Rodriguez v. Dist. Court,* 719 P.2d 699, 704 (Colo.1986) (*"Rodriguez I"*). An attorney has a continuing duty to keep confidential any information learned during the prior representation of the witness. *Id.* This duty creates the possibility that the attorney will be hindered in cross-examining the witness, which thus impedes the attorney's ability to zealously represent the current client. *Id.*

▇▇▇ It is well established, however, that a defendant can waive the right to conflict-free counsel so long as the waiver is voluntary, knowing, and intelligent. *Martinez,* 869 P.2d at 524–25; *Castro,* 657 P.2d at 945–46. A defendant who validly waives the right to conflict-free counsel cannot later make a claim of ineffective assistance of counsel due to a conflict of interest. *Martinez,* 869 P.2d at 524. We have previously

held that a defendant's right to retain counsel of choice, even in the face of a potential or actual conflict, is entitled to great deference but must be balanced with the "paramount necessity of preserving public confidence in the integrity of the administration of justice." *Rodriguez I,* 719 P.2d at 705–06. In determining whether to accept a defendant's waiver of the right to conflict-free counsel, the trial court must evaluate: 1) the defendant's preference for particular counsel; 2) the [prosecution] witness' right to confidentiality of communications; 3) the public's interest in maintaining the integrity of the judicial process; and 4) the nature of the particular conflict of interest involved. *Id.* at 706.

It is important to understand the timeline of events before analyzing whether Dunlap was denied the effective assistance of counsel due to Lewis' alleged conflict of interest. Lewis represented Kirkpatrick from late August 1994 until late November 1994. For this entire period of time, Lewis was also representing Dunlap; the charges against Kirkpatrick were entirely unrelated to the Chuck E. Cheese case. On November 17, 1994, Lewis became aware that Kirkpatrick and Dunlap had jointly attempted to escape from the Arapahoe County Jail. Lewis promptly filed motions to withdraw as Kirkpatrick's counsel. These motions were granted and Mr. Craig Truman replaced Lewis as Kirkpatrick's counsel. The trial record reveals that in December 1994, around the one-year anniversary of the Chuck E. Cheese crimes, Dunlap began making statements to Kirkpatrick regarding Dunlap's commission of the crime. Kirkpatrick first met with the district attorney in January 1995 to provide the People with the information Kirkpatrick had learned about the crime.

The People first brought the potential conflict of interest to the attention of the trial court during a pre-trial hearing on August 1, 1995.[19] Kirkpatrick had been called to the stand and sworn-in when the prosecutor informed the trial court of the potential conflict of interest. The attorneys and the court engaged in a discussion regarding the issue

---

**19.** There were also potential conflicts of interest with two other possible prosecution witnesses.

The trial court's resolution of those issues is not before us.

and the following relevant comments were made:

> THE COURT: Now I want to make something as clear as I can. This case . . . is approaching two years of age and the notion, even the suggestion that anything related to this kind of an issue could somehow affect the viability of Mr. Lewis and Mr. Gayle's representation of Mr. Dunlap is unacceptable to the court because if for some reason that were to occur, aside from the massive expense for starting up all over again, the delay on what I understand to be 13 or 14 thousand pages of discovery is intolerable in this case.
>
> . . . .
>
> So I will not allow a situation to arise in a limited witness area where somehow one or two witnesses out of a score or hundreds or whatever it is will prevent this trial from moving forward in an appropriate time frame.
>
> Whatever I have to do, and it will be as narrow as it can be . . . in terms of any ruling, whatever I have to do to stop that from happening I will do.
>
> . . . .
>
> There's a trial set January 16, it's going, and whatever I have to do, that's going to happen.
>
> . . . .
>
> THE PROSECUTOR: Before we move ahead, what's the court saying, is the court saying we cannot call Mr. Kirkpatrick?
> THE COURT: Did you hear what I said?
> THE PROSECUTOR: Apparently not.
> THE COURT: I said I would rule as narrowly as I could. I'm not making a finding. It's possible that that's a ruling if that's the narrowest ruling, but I'm not doing that, all I'm saying is I'm not going to allow a situation to arise where because of one or two witnesses—now if I were to learn, and I'm sure I wouldn't, that Mr. Lewis and/or Mr. Gayle were involved in a hundred witnesses, I've got a problem, but if it's one or two witnesses that is holding this thing up, then I've got to determine what the proper remedy is and if there is a way to insulate these gentlemen on this

and still allow Mr. Dunlap to retain these lawyers, I'll certainly do that.

> But if it comes down to the point . . . where I perceive after careful analysis that allowing this to go forward presents a real risk of reversible error, you bet I might have to enter that order after consideration. I'm not doing that at this point.

(R. Vol. 38A, 13–15.)

After this colloquy, the matter was put on hold and the trial court moved to other business. The conflict of interest issue was not revisited until December 1995. On December 19, 1995, the People filed a "Motion for Inquiry into Defense Conflict of Interest." A motions hearing was held on December 20, 1995, at which Kirkpatrick took the stand and waived the attorney-client privilege between himself and Lewis.[20] After Kirkpatrick was dismissed from the stand, the defense made an oral motion in limine requesting the People be prohibited from inquiring about Kirkpatrick's and Lewis' prior relationship. After both counsels' argument, the trial court "provisionally granted [the motion] as to any relationship between Mr. Lewis and Mr. Kirkpatrick," but the court left open the possibility of inquiry if Kirkpatrick fabricated testimony or if the defense opened the door to such questioning. Finally, the defense, through attorney Gayle, stated on the record that Lewis was Dunlap's counsel of choice:

> Mr. Dunlap wants the record to be clear that Mr. Lewis is his counsel of choice in the Sixth Amendment sense; that Mr. Dunlap has had a two year relationship with Mr. Lewis. Mr. Dunlap trusts Mr. Lewis, has confidence in the strategic choices that Mr. Lewis is making, trusts choices that he is making. Mr. Dunlap also knows that Mr. Lewis is the most experienced capital lawyer in the state of Colorado. . . . Mr. Dunlap's counsel of choice is Forrest Lewis.

(R. Vol. 56, 113.)

The following day, December 21, 1995, the trial court appointed Mr. Jeffrey Pagliuca as special counsel to independently advise Dun-

---

**20.** The validity of Kirkpatrick's waiver has not been contested and we therefore assume it was valid.

lap on the conflict of interest issue. On January 10, 1996, the trial court held a final hearing on the issue. Pagliuca represented to the court that he met with Dunlap for hours, and that in his opinion there was no actual conflict of interest that precluded Lewis from continuing to represent Dunlap. Pagliuca also tendered to the trial court a "Verified Waiver of Conflict Free Counsel" that Dunlap had signed. Paragraph 11 of the waiver stated that Dunlap understood the prior relationship between Lewis and Kirkpatrick and also understood the testimony that Kirkpatrick would be offering at trial. Paragraph 12 recognized that Kirkpatrick waived the attorney-client privilege, and that therefore no actual conflict existed. Prior to accepting Dunlap's purported waiver of conflict-free counsel, the court questioned Dunlap about whether he understood the right that was being waived:

> THE COURT: Now, in [this] kind of a situation you still could come before me and say that you have concerns that Mr. Lewis was representing you in any way other than a full, aggressive, and complete way. Do you understand that.
>
> THE DEFENDANT: Yes.
>
> THE COURT: Now have you talked as this document, Verified Waiver of Conflict-free Counsel, says to Mr. Pagliuca about this issue?
>
> THE DEFENDANT: Yes, I have.
>
> THE COURT: Do you understand everything about it from your perspective?
>
> THE DEFENDANT: Yes.
>
> THE COURT: What problems, if any, do you see with Mr. Lewis representing you, having previously or before representing [sic] Mr. Kirkpatrick.
>
> THE DEFENDANT: None at all.
>
> THE COURT: All right. Are you telling me that on a free and voluntary basis?
>
> THE DEFENDANT: Yes, I am.
>
> THE COURT: Has anybody forced or pressured you to do that?
>
> THE DEFENDANT: No.
>
> THE COURT: Do you understand that you would have the right to raise that issue at this time?
>
> THE DEFENDANT: Oh, yeah.
>
> . . . .

> THE COURT: Mr. Dunlap … if you don't raise it now and you waive your right to conflict-free counsel, you waive it for this trial now and throughout this trial. Did you talk to Mr. Pagliuca about that?
>
> THE DEFENDANT: I don't have no problem with them representing me because they represented somebody else. Now, if I go to trial and everything and they start doing some outlandish stuff, you know what I'm saying, then I'm going to have some problems with that.
>
> THE COURT: Well, that's what I want to talk to you about right now.
>
> The law says that if you waive this right to assert this kind of an issue now, there are other things you can raise later on. You can raise other issues.
>
> THE DEFENDANT: All right.
>
> THE COURT: Okay. I mean, if you're not happy with the way they're performing, you can talk to me about that later on.
>
> THE DEFENDANT: I waive all of our *Rodriguez* issues. That's the term you all use all the time. I waive that. I have no argument with these issues.
>
> THE COURT: The point I'm trying to make to you, Mr.
>
> Dunlap, is this. If you give these issues up now, you give up those what you call *Rodriguez* issues throughout this trial.
>
> THE DEFENDANT: Okay. That's cool.
>
> THE COURT: While you may ask about other things concerning Mr. Gayle and Mr. Lewis later on, these issues are forever given up for trial. Do you understand that?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: Knowing these things, do you persist and continue with your waiver that you've expressed?
>
> THE DEFENDANT: Yes, I do.

(R. Vol. 58, 17–19.) The trial court specifically found that Dunlap voluntarily, knowingly, and intelligently relinquished his right to conflict-free counsel.

The record, as set forth above, demonstrates that Dunlap voluntarily, knowingly, and intelligently waived his right to conflict-free counsel. Pagliuca's appointment ensured that Dunlap received independent ad-

vice regarding the possible conflict, and the trial court properly questioned Dunlap before accepting his waiver. Importantly for purposes of *Rodriguez*, Dunlap stated numerous times on the record, and in strong terms, that Lewis was his counsel of choice. This preference is entitled to deference. *Rodriguez I*, 719 P.2d at 705. Dunlap's preference was not outweighed by Kirkpatrick's interest in the confidentiality of his communications with Lewis, as Kirkpatrick made a voluntary, knowing, and intelligent waiver of his attorney-client privilege. *Id.* at 707 (noting that the prosecution witness did not object to her prior attorney's representation of the defendant). Kirkpatrick's waiver also ensured the defense would not suffer from divided loyalties that would hinder its cross-examination of Kirkpatrick.[21] In short, the record does not support Dunlap's claim that this conflict was non-waivable, and the trial court did not err under *Rodriguez* by accepting Dunlap's waiver. Dunlap argues, however, that two circumstances unknown at the time of his waiver make the waiver invalid and prove that he was denied the effective assistance of counsel.

First, neither the trial court nor any of the attorneys informed Pagliuca of the court's August 1, 1995, comments regarding, as Dunlap characterizes it, the strong likelihood that Kirkpatrick would not be allowed to testify if Dunlap refused to waive his right to conflict-free counsel. Dunlap argues that trial counsel's failure to inform Pagliuca of the trial court's comments was ineffective assistance of counsel.[22] In evaluating this claim, the 35(c) court disagreed with Dunlap's assertion that the trial court used "strong and certain terms" to indicate that Kirkpatrick would be prevented from testifying. We agree with the 35(c) court's reading of the record. Although the trial court expressed a strong desire not to allow one or two witnesses to further delay the start of the trial, the court also took pains to make clear that it was not entering a ruling or making a finding at that time. Further, Lewis testified at the 35(c) hearing that his impression at the time was that Kirkpatrick would testify. Because the trial court never ruled otherwise it was not unreasonable for counsel to not inform Pagliuca of the court's comments.[23]

■■■ Second, Dunlap argues that Lewis produced evidence against him in order to assist Kirkpatrick, thus demonstrating an actual conflict of interest. A defendant who does not object at trial to counsel's representation can prevail on an ineffective assistance of counsel claim, without having to prove prejudice, by showing that an actual conflict of interest adversely affected trial counsel's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052; *Castro*, 657 P.2d at 943.[24]

21. Gayle performed Kirkpatrick's cross-examination. This alone could not have cured a conflict of interest, however, as any confidential information gained by Lewis during the prior representation would be imputed to Gayle. *See Rodriguez I*, 719 P.2d at 704.

22. In a related argument, Dunlap claims that he was essentially unrepresented on the conflict issue because Pagliuca was not aware of the trial court's comments. We are not persuaded by Dunlap's argument. Dunlap met with Pagliuca for several hours. Pagliuca testified at the 35(c) hearing that, even without knowing of the trial court's comments, he most likely advised Dunlap of the possibility that Kirkpatrick would not be allowed to testify if Dunlap did not waive the right to conflict-free counsel. Although Pagliuca might have more thoroughly discussed this possibility had he known of the August 1, 1995, discussion, Dunlap was sufficiently advised of his rights before waiving the right to conflict-free counsel.

23. This is not to say, of course, that the better practice would not have been to inform Pagliuca of the trial court's discussion.

24. The *Cuyler* standard operates as an exception to the normal requirements of *Strickland*, and was announced in the context of an attorney's multiple concurrent representation of defendants. *Mickens v. Taylor*, 535 U.S. 162, 175–76, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); *Cuyler*, 446 U.S. at 337–38, 100 S.Ct. 1708. The federal courts of appeals have expanded the application of *Cuyler* to many different types of conflicts, including the prior representation of a prosecution witness. *See Mickens*, 535 U.S. at 174, 122 S.Ct. 1237 (listing cases); *United States v. Winkle*, 722 F.2d 605, 610 (10th Cir.1983); *see also United States v. Soto Hernandez*, 849 F.2d 1325, 1328–29 (10th Cir.1988). The Supreme Court has made clear that it is an open question whether applying the *Cuyler* exception to conflicts other than multiple concurrent representation is proper, or whether the normal *Strickland* analysis applies. *Mickens*, 535 U.S. at 174–76, 122 S.Ct. 1237. In this case, the parties' briefs assume *Cuyler* applies and argue the issue as being

In November 1995, Lewis provided Truman, Kirkpatrick's attorney, with a letter that Kirkpatrick had written to Dunlap. In the letter, Kirkpatrick expressed anger at Dunlap because Dunlap had put a snitch "jacket" on him. Truman subsequently turned this letter over to the prosecutor and Kirkpatrick briefly testified about the letter at trial. We reject Dunlap's argument that Lewis abandoned and betrayed Dunlap, thus proving an actual conflict of interest, by sending the letter to Truman.

In some cases, a defense attorney can so align themselves with the prosecution or other third party that the duty of loyalty is violated and the defendant is denied the effective assistance of counsel. *See, e.g., Osborn v. Shillinger*, 861 F.2d 612, 628–29 (10th Cir.1988) (defense counsel abandoned the defendant by publicly making statements that the defendant had no evidence to support his claims and was not amenable to rehabilitation; defense counsel also wrote a post-sentencing letter to the court stating that the defendant deserved the death penalty); *State v. Holland*, 876 P.2d 357 (Utah 1994) (defense counsel abandoned the defendant by arguing, on behalf of another client, that the defendant was a "prime candidate for the death penalty"). This is not such a case. While Dunlap argues that Lewis gave the letter to Truman so that Kirkpatrick could negotiate a better plea bargain for himself, Dunlap offers no evidence to support this argument. We decline to find ineffective assistance of counsel based on such speculation. *Cf. People v. Holman*, 164 Ill.2d 356, 207 Ill.Dec. 467, 647 N.E.2d 960, 966 (1995) ("A defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation . . . .") (discussing the *Strickland* standard).

Dunlap next argues that, whatever Lewis' motivation, producing evidence against one's client automatically creates an actual conflict of interest. Dunlap offers no legal authority to support this argument and we are not

convinced that an actual conflict of interest existed in this case. The letter was not the strong evidence against Dunlap that Dunlap portrays it to have been. The letter simply expressed, very briefly, that Kirkpatrick was upset with Dunlap; Kirkpatrick's trial testimony about the letter consisted of only a few questions. Additionally, Lewis turned the letter over to Kirkpatrick's attorney, not to the prosecution. While perhaps Lewis should have foreseen that the letter would get back to the prosecution, this isolated incident is not sufficient to prove an actual conflict of interest or to justify awarding postconviction relief.[25]

In sum, Dunlap waived his right to conflict-free counsel. Trial counsel's failure to tell Pagliuca of the trial court's August 1, 1995, comments neither invalidated this waiver nor was it ineffective assistance of counsel. Furthermore, Lewis giving the letter from Kirkpatrick to Kirkpatrick's attorney does not prove an actual conflict of interest existed. Dunlap has not proven ineffective assistance of counsel.

## C. Failure to Present Future Dangerousness Mitigation

Dunlap next claims that trial counsel's decision during the penalty phase to not introduce into evidence a video which showed the stringent security features of the Colorado State Penitentiary ("CSP") was ineffective assistance of counsel. Dunlap argues that the defense should have played the video for the jury to demonstrate that, if given a life sentence and housed at CSP, he would not pose a dangerous threat to others. Dunlap maintains that such evidence would have effectively rebutted the prosecution's arguments regarding Dunlap's future dangerousness. The 35(c) court did not make a finding as to *Strickland's* performance prong, but instead disposed of the issue by finding that Dunlap had not proven prejudice. While it is appropriate for a court to find that

---

whether an actual conflict adversely affected counsel's performance. We therefore decide the issue on the assumption that *Cuyler* applies. *See Mickens*, 535 U.S. at 174, 176, 122 S.Ct. 1237 (deciding the case on the parties' assumption that *Cuyler* would apply while noting that an open question remained).

**25.** We also note that the 35(c) court specifically found Lewis acted within his ethical obligations as an officer of the court.

a defendant failed to carry his or her burden on the *Strickland* prejudice prong without deciding whether counsel's performance was substandard, *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052, we elect to address whether counsel's performance was substandard.

■ In evaluating a claim of ineffective assistance of counsel because of a failure to present available mitigating evidence, a reviewing court must examine counsel's reasons supporting the decision not to present the evidence. *Brecheen v. Reynolds*, 41 F.3d 1343, 1368 (10th Cir.1994). If trial counsel had a reasonable basis for a strategic decision, then the decision enjoys a strong presumption of correctness and the inquiry is generally at an end. *Id.* (internal quotations omitted); *see also Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

Lewis testified at the 35(c) hearing that he and the defense team chose not to introduce the video because they did not think the tape would "weigh heavily" in the jury's sentencing decision. Furthermore, the defense knew that the People had a videotape of a less secure facility, where convicted murderers were housed, that would potentially be played for the jury to rebut the CSP video. The introduction of this counter-video would, the defense feared, raise a question in the jurors' minds of whether Dunlap would be permanently housed at CSP. In light of these considerations, the defense ultimately decided not to utilize the CSP video. Although Dunlap disagrees with this strategic choice, he has not proven that the decision fell below "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

We also affirm the 35(c) court's holding that Dunlap was not prejudiced by trial counsel's decision to not introduce the CSP video. *See* Discussion, section III.A.4, *supra.*

### D. Opening Statements in Guilt and Penalty Phases

Dunlap next claims that he was denied effective assistance of counsel in the opening statements of both the guilt and penalty phases of the trial. Dunlap argues that trial counsel promised the jury certain evidence and that those promises went unfulfilled. Dunlap maintains that making such unful-filled promises was deficient performance, and that the deficient performance was prejudicial because it adversely affected the jury's verdict at sentencing. We disagree.

As with the CSP video argument, the 35(c) court did not make a specific finding as to *Strickland's* performance prong and instead simply held that Dunlap failed to prove prejudice with regard to either of the opening statements. We again elect to address whether counsel's performance was substandard and find that it was not.

#### 1. Guilt Phase Opening Statement

■ Steven Gayle delivered the opening statement for the defense during the guilt phase of the trial. Dunlap argues that Gayle promised evidence to support the following arguments:

- The survivor of the Chuck E. Cheese shooting misidentified Dunlap;
- The witnesses against Dunlap lied;
- Dunlap made false statements to the police that would be explained by an understanding of his home life and upbringing; and
- Two named witnesses, Charles Gonzales and Judy Roberts, would testify to facts in support of an alternate suspect theory.

Dunlap claims the defense never presented the promised evidence.

■ An opening statement is intended to inform the jury of the facts that the party intends to prove at trial. *Thompson v. People*, 139 Colo. 15, 21, 336 P.2d 93, 97 (1959). The course of a trial can affect and alter an original defense strategy, and may lead to reasonable decisions not to call witnesses who were mentioned in the opening statement. *See, e.g., Williams v. Bowersox*, 340 F.3d 667, 671–72 (8th Cir.2003); *Schlager v. Washington*, 113 F.3d 763, 769 (7th Cir. 1997); *United States v. McGill*, 11 F.3d 223, 227–28 (1st Cir.1993). In other cases, however, failing to produce evidence promised in the opening statement can be an unreasonable and prejudicial decision which denies a defendant the effective assistance of counsel. See, *e.g., Ouber v. Guarino*, 293 F.3d 19, 22–24, 27–30 (1st Cir.2002); *Harris v. Reed*, 894

F.2d 871, 877–78 (7th Cir.1990); *Anderson v. Butler,* 858 F.2d 16 (1st Cir.1988); *State v. Moorman,* 320 N.C. 387, 358 S.E.2d 502, 510–11 (1987). Determining whether the failure to call a promised witness is ineffective assistance of counsel is necessarily fact-based. *McGill,* 11 F.3d at 227.

The record in this case does not support Dunlap's argument that the guilt phase opening statement fell below an objective standard of reasonableness. As an initial matter, Dunlap misrepresents both the theme of the defense opening and the record. The predominant defense theme during the opening statement was that the jury needed to fairly and objectively evaluate the evidence and hold the People to their burden of proof. In carrying out this theme, Gayle discussed facts which cast doubt over the People's case. For example, Gayle suggested that the surviving eyewitness, Bobby Stephens, had only a few seconds, under stressful circumstances, to observe the shooter. This discussion in the opening was followed through during the cross-examination of Stephens. Gayle also argued that many of the witnesses against Dunlap had motives to lie, and had previously lied about this case, in order to protect themselves and obtain favorable deals in their own criminal cases. This line of argument was also followed through in the cross-examination of the witnesses.

Dunlap is correct, however, that Gayle mentioned two potential witnesses by name during the opening statement who were never called during the trial. These witnesses were to be called to support an alternate suspect theory. Some testimony elicited during the cross-examination of the People's witnesses did support an alternate suspect theory; for example, one witness testified that she left the Chuck E. Cheese shortly before the murders and had seen a man walking toward the front of the restaurant. The defense also attempted to introduce the promised evidence through the cross-examination of one of the police investigators, but the trial court ruled the evidence inadmissible at that point. Although the defense could have called the named witnesses in order to get the evidence, counsel determined after trial began that it would be better not to call any witnesses. Dunlap presents no evidence to prove that the decision not to call the witnesses was anything but a good faith, strategic decision made after trial was underway.

With regard to the evidence of Dunlap's family history that Gayle mentioned in the opening statement, Lewis admitted at the 35(c) hearing that little if any such evidence was presented to the jury during the guilt phase. Evidence of Dunlap's upbringing and family was presented in the penalty phase, however, and the penalty phase is when Dunlap claims Gayle's deficient performance caused prejudice. We fail to see any reasonable probability that either introducing such evidence in the guilt phase (or omitting mention of it in the opening) would have altered the jury's verdict at the penalty phase, given that the jury heard such evidence during the penalty phase. Dunlap has not proven the guilt phase opening statement denied him the effective assistance of counsel.

We further affirm the 35(c) court's holding that, even if the guilt phase opening statement was deficient, Dunlap was not prejudiced. *See* Discussion, section III.A.4, *supra.*

### 2. Penalty Phase Opening Statement

Dunlap argues that Forrest Lewis' penalty phase opening statement was similarly deficient in that Lewis promised expert testimony and studies linking violent behavior to an abusive home life and evidence of that nature was not produced. Dunlap also complains that Lewis' opening described more evidence of an abusive home life than was actually presented.

The relevant portions of the opening are as follows:

The answers may come from a variety of sources and from a variety of kinds of witnesses. They may come from an elderly gentleman from Pine Bluff, Arkansas and his family, they may come from a former neighbor, they may come from a probation officer. It may come from some of the prosecution's own witnesses. *It may come from people in academic fields, such as criminology and psychology and psychiatry.* It may come from the experience of a probation officer coupled with the experience of a couple of teenage girls. It

may come from the observations of neighbors and friends.

(R. Vol. 89, 4273) (emphasis added).

You may hear about this from probation officers, from psychiatrists, from criminologists, from different people, but the studies have identified that family influence and that family upbringing is the single most important common thread for this unbelievable kind of violence and its not stopping.

(R. Vol. 89, 4284) (emphasis added).

Although Lewis stated a possibility that expert testimony and academic studies would be presented, he neither dwelt on the possible evidence nor unconditionally promised it would be introduced. More importantly, however, the record reflects that at the time of the opening statement trial counsel was still considering calling Dr. Rebecca Barkhorn to the stand. The final decision not to call her was only made after Adenia Dunlap, Dunlap's sister, and Thomas Moore, Dunlap's former probation officer, testified. The decision to not call Dr. Barkhorn was reasonable given the defense team's favorable impression of Adenia Dunlap's and Thomas Moore's testimony, and in light of the possibility the CMHIP evidence would be admitted if she were called. These facts distinguish this case from those cases where trial counsel has been found ineffective for a failure to produce promised evidence. *See, e.g., Ouber*, 293 F.3d at 22–24, 27–30 (defense counsel was ineffective for repeatedly promising and emphasizing the importance of defendant's testimony in opening statement and then failing to call defendant); *Harris*, 894 F.2d at 877–78 (attorney acted unreasonably in alluding to a viable theory of defense in the opening but calling no witnesses to support such theory and in not interviewing the two available witnesses to support such a theory); *Anderson*, 858 F.2d at 17 (defense counsel promised to present the testimony of a psychologist or psychiatrist to explain defendant's mental state the night of the crime, but rested the defense case the next day without presenting such evidence); *Moorman*, 358 S.E.2d at 510–11 (attorney was ineffective for promising a "critical piece of

evidence" proving the defendant was physically and psychologically incapable of committing the crime, when the attorney had no reason to believe such evidence existed).

We also find Dunlap's argument that trial counsel did not produce sufficient evidence of Dunlap's upbringing and abusive home life to be without merit. The defense called nine witnesses during the penalty phase, most of whom testified about the Dunlap household. *See* Discussion, section III.A.1, *supra*. These witnesses included Dunlap's mother, sister, former probation officer, former neighbor, members of his former foster family, and his mother's former co-workers. That these witnesses did not provide as graphic of testimony as trial counsel had anticipated or hoped does not render counsel's representation ineffective.

We further affirm the 35(c) court's holding that, even if the penalty phase opening statement was deficient, Dunlap was not prejudiced. *See* Discussion, section III.A.4, *supra*.

### E. Penalty Phase Closing Argument

■ Dunlap's next contention of ineffective assistance of counsel concerns trial counsel's closing argument at the penalty phase. Dunlap argues that the closing amounted to abandonment and therefore fell below an objective standard of reasonableness, and that the deficient performance caused prejudice.[26] The 35(c) court found that the closing argument was not substandard but that, even if it were, Dunlap had failed to prove prejudice. We agree that the closing argument did not fall below an objective standard of reasonableness.

In evaluating an ineffective assistance of counsel claim, we must look to the totality of the circumstances, evaluate the claim based on counsel's perspective at the time, and afford great deference to counsel's strategic decisions. *Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052. Deference to counsel's decisions at the closing argument stage of trial is particularly important. *Yarborough v. Gentry*, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). In another capital case where defense counsel gave a closing argument similar to the one here, we found that counsel's performance did not fall below an objective

---

**26.** At the 35(c) hearing Dunlap presented expert attorney witnesses who opined that Lewis' clos-

ing argument was ineffective assistance of counsel.

standard of reasonableness. *Davis v. People,* 871 P.2d 769, 776–78 (Colo.1994) ("*Davis II* "). In *Davis II,* defense counsel repeatedly told the jury that at times he hated Davis, Davis was a bad person, and there was no excuse for the crimes that Davis had committed. *Id.* at 776–77. Davis' counsel, however, also questioned the morality of the death penalty, asked the jury to show mercy toward Davis, and argued that the other individual involved in the crime, who had received a life sentence, was more culpable. *Id.* at 777. We therefore found that counsel's performance "fell within the range of professionally competent assistance required by *Strickland.*" *Id.* at 778.

Dunlap specifically alleges that Lewis dehumanized him, repeatedly stressed Dunlap's responsibility for the crimes, admitted that the defense failed to provide mitigation evidence, and gave the jury license to choose the death penalty.[27] The portions of the closing that Dunlap points to, when read alone and out of context, raise the specter of deficient performance. For example, Lewis began the closing by stating:

> How can anyone be so cold? How can anyone be so cruel, I said? What road can anyone go down that could take them to the point where they could make the choices that were made at Chuck E. Cheese? I still don't know.

> I told you I would try. I tried to give you the bits and pieces that I could.

> Whether or not it makes any difference to Nathan Dunlap at all, it's something we need to ask. It's something we need to try and find out in this courtroom and out there. It's a disturbing question.

> I promised you that I was not confused as to who the victims are in this case, and that's still clear to me. And it always will be. I must try to answer those questions.

(R. Vol. 95, 5747–48.)

---

**27.** Lewis at one point stated: "If you choose to kill my client under the facts of this case, I will respect your decision and you will hear not one word of criticism of you from me." (R. Vol. 95, 5773.)

**28.** Lewis explained at the 35(c) hearing:

Later in the closing argument, Lewis stressed Dunlap's responsibility for the murders:

> I don't know what this all means or if it means anything to you in this case, and that's for you to decide, not for me. And I have failed as I knew I would fail to provide the answer that I so desperately have wanted to provide maybe for myself since this case began. I gave you all I could. Carol Dunlap didn't shoot those people at Chuck E. Cheese. Jerry Dunlap didn't shoot them. Neither did Trey Burks or Tony Schalk or Carl Wilson. They all had their part, but they didn't make that awful choice to do that. Nathan made that himself.

> You don't need psychologists and experts, though, to tell you from the bits and pieces that we've seen that who we are and even the choices we make are shaped often by our very early years, by who we're around and by what we're exposed to. We don't need experts to tell you that.

> Those people didn't shoot the folks at Chuck E. Cheese. I'm not saying that they did or that they even had anything to do about it or that they even would have approved it, encouraged it. I'm not suggesting that at all.

> But there are bits and pieces of the road that Nathan went down that took him to the place which he could do that. We're talking about ugly emotions like anger, revenge, perhaps hate. The kind of emotions that end in violence, the kind of emotions that end in killing, the kind of emotions that were there at Chuck E. Cheese and led to these awful choices.

(R. Vol. 95, 5768–69.)

Reading the closing as a whole, however, Lewis clearly had a strategy. With regard to his statement to the jury that he would respect their verdict, even if it were to impose the death penalty, Lewis explained at the 35(c) hearing that he was attempting to empower just one juror to vote for a life sentence.[28] Moreover, the bulk of the closing

> I was trying to empower one person, just one. That was my best day and I knew it. I was trying to empower just one person who would go back and say we shouldn't be afraid to do a life sentence here. Everybody under— you know, we shouldn't be afraid, that our verdicts will be respected no matter what it is,

argument was spent surveying the mitigation evidence the defense had presented and suggesting that each provided a "bit and piece" of the answer to the question of what road could lead to the violence that occurred at Chuck E. Cheese. Many "bits and pieces" of the answer, Lewis argued, rested with the family that Dunlap grew up in, the abuse he suffered, and the lack of positive role models in his life. Lewis implored the jury to consider whether Chuck E. Cheese would have occurred had Dunlap grown up in a different household or had better role models:

> We will all find a role model. You have yours, thank God. It's too bad that [Dunlap] hadn't spent more time with Ben Jordan.
>
> . . . .
>
> What does it all mean in terms of mitigation? The only way I can suggest to put it all in perspective is this: Do you really think—do you really think that Nathan Dunlap would have become a killer, a cold-blooded killer, if he would have grown up in Pine Bluff, Arkansas with [his foster parents]?
>
> Think about it.
>
> You want to put this in perspective. Take him back to Pine Bluff, Arkansas and tell Carol Dunlap to butt out and leave him and Adinea right there with [his foster parents]. . . . Let them go to church not with Jerry Dunlap, who's sexually assaulting Adinea in the basement on Saturday night, let them go to church with [the foster father].
>
> Ask yourselves this question: Is there any doubt in your mind, do you think Nathan Dunlap would have grown up to be

a killer if he had lived in the [foster family's] house instead of the Dunlaps'?

(R. Vol. 95, 5768–70.)

Lewis also concluded the closing argument by asking the jury to choose life and not more violence:

> Great violence and killing, like the Chuck E. Cheese killings, is caused by anger, by hate, by revenge. Don't base your decision on hate. It would be easy to do in this case. Don't base you decision on revenge or vengeance or any other motive like that. Don't base it on some emotion or feeling that five or ten years from now down the road you're going to say that wasn't the right reason.
>
> In the last step of the deliberative process you're called upon in the final analysis—after going through all this as objective evaluation as it can be, in the final analysis you're called upon to make a choice. Nathan Dunlap chose to kill. He should be held accountable for it. He has been held accountable for it. He chose to do so because of disgusting reasons.
>
> You have a choice now, too. Choose life, life in prison without any possibility of parole, but life. Not violence, not killing, but life.

(R. Vol. 95, 5773–74.)

Trial counsel in this case was faced with a horrible crime, a defendant who had repeatedly failed to show remorse for his actions, and overwhelming aggravation. Lewis testified at the 35(c) hearing that his strategy was, in part, to maintain credibility with the jury by admitting the horror of the crime and Dunlap's responsibility; given the circumstances, this was a perfectly reasonable choice. *See Yarborough*, 540 U.S. at 9, 124 S.Ct. 1 ("By candidly acknowledging his

---

that our verdict has been respected in the trial on the charges. And we said so and we said you're entitled to that respect.

And I wanted to empower somebody to say we're the jury and our verdict will be respected, Lewis will respect it, they'll respect it, everybody will respect it. And that empowerment was important in this case because it was a case where it would be easy for them to go back and say this is awful and we have the aggravators that have been proven, and I felt

that in their minds one of the things had to be, you know, not will we be respected if we come back with a death verdict, I think they all felt that. I think they were wondering what will people think if we come back the other way.

And so in some way I was trying to suggest to them the converse of that proposition and to have someone say we're entitled to our verdict to be respected and I'm entitled to my opinion. Lewis said that he'd respect your verdict, Juror No. 3, now you respect mine.

(R. Vol. LXV, 149–50.)

client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case."); *Davis II,* 871 P.2d at 777. Furthermore, Lewis wanted to express sympathy for the victims as an attempt to compensate for Dunlap's own lack of remorse, which we also find to have been reasonable. Lewis' focus on Dunlap's dysfunctional home life and lack of positive role models was also, given the circumstances trial counsel faced, a reasonable tactical choice. Dunlap's ineffective assistance of counsel claim thus fails.

### F. Stipulation to Gang Affiliation Evidence

■ Dunlap next alleges that he was denied effective assistance of counsel because at the penalty phase trial counsel stipulated to Dunlap's affiliation with a gang that called itself the "UNC." We find that Dunlap's argument lacks merit.

Lewis testified at the 35(c) hearing that he stipulated to Dunlap's involvement with the UNC during the penalty phase because:

> [a]t that point in time the gang affiliation fit into our theory of peer influence and it fit into our theory of the propensity to violence among this entire group of people.... I felt it was part of the peer influence theme that we were trying to show.

(R. Vol. LXII, 115.)

As explained previously in this opinion, the record shows that at the penalty phase the defense argued Dunlap should be spared the death penalty because the road to Chuck E. Cheese was largely paved by others, including Dunlap's peers. Given this strategy, which we decline to second guess in hindsight, the stipulation to the gang affiliation evidence was a reasonable strategic choice.

### G. Failure to Object to the People's Closing Argument

■ The People, during its penalty phase closing argument, referenced the fact that Dunlap did not plead guilty to the Chuck E. Cheese murders.[29] Dunlap argues that in so doing the People improperly attacked his right to remain silent, right to plead not

guilty, and right to trial by jury; consequently, Dunlap maintains the failure to object was ineffective assistance of counsel. The 35(c) court held that the failure to object was deficient performance of counsel, but that the *Strickland* prejudice prong was not satisfied. The People cross-appeal the performance holding, and we reverse.

■ A defendant's exercise of the right to remain silent and the right to a trial by jury may not be used by the prosecution to infer guilt. *Griffin v. California,* 380 U.S. 609, 614–15, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *People v. Rodgers,* 756 P.2d 980, 983 (Colo.1988); *People v. Ortega,* 198 Colo. 179, 183, 597 P.2d 1034, 1037 (1979). A prosecutor is allowed, however, to respond to arguments put forth by the defendant or defendant's counsel. *United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) ("[W]here ... the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege."); *People v. Krutsinger,* 121 P.3d 318, 324 (Colo.App.2005) ("The prosecution is afforded considerable latitude in replying to opposing counsel's arguments."). In this case, the defense argued in its opening statement, and produced evidence during the penalty phase, that at one point Dunlap had been willing to plead guilty. This evidence was produced to support the statutory mitigator of "[t]he extent of the defendant's cooperation with law enforcement officers or agencies and with the office of the prosecuting district attorney." Arguably, therefore, the People's comment during closing argument was proper and an objection would have failed.

We need not decide, however, whether the prosecutor's comment was or was not proper in order to assess whether trial counsel's failure to object was unreasonable. Dunlap's claim that the failure to object clearly fell below an objective standard of reasonableness is undermined by the fact that whether the prosecutor's comment was improper is not clear-cut. Furthermore, Lewis testified that he did not object at every potential

---

**29.** The prosecutor stated: "And you know, when asked, well, why didn't he plead guilty, we never

got an answer, did we? Huh-uh." (R. Vol. 95, 5733.)

opportunity during trial because he believed doing so decreases an attorney's credibility with the jury and calls undue attention to the objectionable material. We agree with those courts that have held this to be a reasonable strategic position. *See, e.g., Zakrzewski v. McDonough,* 455 F.3d 1254, 1258–60 (11th Cir.2006); *United States v. Necoechea,* 986 F.2d 1273, 1281 (9th Cir.1993); *Hansford v. Angelone,* 244 F.Supp.2d 606, 613 (E.D.Va. 2002); *Caylor v. State,* 255 Ga.App. 362, 566 S.E.2d 33, 35 (2002). We decline to find counsel's failure to object to the People's closing to be deficient performance.[30]

### H. Cumulative Prejudice

Dunlap argues that the cumulative effect of trial counsel's deficient performance with regard to the lack of a mental health mitigation investigation, the penalty phase closing argument, and the failure to object to the People's closing argument was constitutionally prejudicial. Because we have found that none of the cited actions by trial counsel fell below an objective standard of reasonableness, we need not reach the argument that they were cumulatively prejudicial.

### IV. Jury Selection

Dunlap next alleges that: 1) the trial court erroneously denied his challenges for cause and, to the extent trial counsel's failure to exhaust peremptory challenges forecloses an appeal of those denials, trial counsel was ineffective and 2) the trial court erroneously granted the People's challenges for cause.

### A. Dunlap's Challenges for Cause

Dunlap argues that he is entitled to post-conviction relief because the trial court denied his challenges for cause of one juror who deliberated, three alternate jurors, and six prospective jurors who Dunlap ultimately struck with peremptory challenges. Dunlap did not exhaust his peremptory challenges, however, and therefore may not be able to raise the denied challenges for cause. Consequently, Dunlap argues that to the extent his failure to exhaust all peremptory challenges forecloses appeal on the denied chal-

lenges for cause, he received ineffective assistance of counsel. We begin by examining which of Dunlap's claims, if any, are foreclosed by the failure to exhaust his peremptory challenges.

 The due process clauses of the Colorado and United States Constitutions guarantee every criminal defendant the right to a fair trial. U.S. Const. amends. V, XIV; Colo. Const. art. II, §§ 16, 25; *People v. Harlan,* 8 P.3d 448, 459 (Colo.2000). The right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois,* 504 U.S. 719, 726–27, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Harlan,* 8 P.3d at 459. To ensure an impartial jury, "[a] trial court must grant a challenge for cause if a prospective juror is unwilling or unable to accept the basic principles of criminal law and to render a fair and impartial verdict based upon the evidence admitted at trial and the court's instructions." *Harlan,* 8 P.3d at 460. In capital cases, a challenge for cause should be granted if the juror's views of the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotation omitted); *People v. Davis,* 794 P.2d 159, 204 (Colo.1990) ("*Davis I*") (adopting the *Witt* standard in Colorado). A defendant's right to a fair trial is implicated where a trial court's erroneous denial of a challenge for cause results in the seating of a juror who should have been struck. *Morrison v. People,* 19 P.3d 668, 671 (Colo.2000) ("[B]ecause [the defendant] challenged [the juror] for cause and she served on the jury, his right to an impartial jury was violated if his challenge for cause was improperly denied.").

 An essential component to ensuring a balanced and impartial jury is allowing a defendant the full use of his peremptory challenges. *Harlan,* 8 P.3d at 459; *People v. Macrander,* 828 P.2d 234, 242–43 (Colo.1992). For this reason, we have held that a defendant is denied the substantial right to the full

---

**30.** Even if the failure to object fell below an objective standard of reasonableness, however, we agree with the 35(c) court that there is no reasonable probability a different sentence would have resulted had counsel objected. Dunlap's claim therefore fails the *Strickland* prejudice prong as well.

use of his peremptory challenges where the trial court erroneously denies a challenge for cause, the defendant uses a peremptory strike to remove the objectionable juror, and the defendant exhausts his peremptory challenges. *Macrander*, 828 P.2d at 244. In such a situation, the error cannot be deemed harmless. *Id.; Carrillo v. People*, 974 P.2d 478, 486–87 (Colo.1999). Because Dunlap failed to exhaust his peremptory challenges, he has no claim that his substantial right to the use of his peremptory challenges was violated. With regard to the prospective jurors who were eventually struck and the alternate jurors who never deliberated, therefore, he cannot appeal the trial court's denial of his challenges for cause. *See, e.g., Ma v. People*, 121 P.3d 205, 210 (Colo.2005); *Rodriguez V*, 914 P.2d at 263; *People v. O'Neill*, 803 P.2d 164, 173 (Colo.1990).

 The denied challenge for cause of the juror who actually deliberated, however, is a different matter. The question whether a defendant's right to a fair trial has been violated is logically independent from the question whether the defendant's right to the full use of peremptory challenges has been violated. *Morrison*, 19 P.3d at 671 n. 3. In *Morrison*, we clarified that a defendant is not required to use a peremptory challenge to strike a biased juror in order to claim his right to a fair trial was denied. *Id.* at 671. Rather, "if the jury included a biased juror, then the defendant's right to a fair trial was violated and his convictions must therefore be reversed." *Id.* at 670. The defendant in *Morrison*, however, had exhausted his peremptory challenges. We specifically left open the question whether a defendant who did not exhaust his peremptory challenges may claim that his right to a fair trial was violated because the trial court erroneously denied a challenge for cause of a seated juror. *Id.* at 670 n. 2. We are now faced with a situation where the defendant claims his challenge for cause was erroneously denied and the allegedly biased juror deliberated, yet the defendant did not exhaust his peremptory challenges. We decline to definitively answer whether a defendant must exhaust his peremptory challenges to appeal a denied challenge for cause of a seated juror, however, because even affording Dunlap the best-case scenario—in which he is able to

appeal the trial court's denial of the for-cause challenge—Dunlap is not entitled to relief. We conclude that the trial court did not err in denying the challenge for cause to Juror C. We then examine whether trial counsel's failure to exhaust all peremptory challenges was ineffective assistance of counsel.

## 1. Dunlap's Denied Challenge for Cause

 Dunlap claims the trial court abused its discretion in denying his challenge for cause of Juror C, who sat on the jury and deliberated. Dunlap maintains that Juror C was biased in favor of imposing the death penalty, placed the burden on Dunlap to prove the appropriateness of a life sentence, and demonstrated an inability to consider mitigation. Dunlap argues Juror C was thus substantially impaired in his ability to follow the law and should have been excused. We disagree.

 The trial court is afforded broad discretion in ruling on whether to excuse a prospective juror for cause; we will overturn a trial court's decision only upon a showing the trial court abused its discretion. *Harlan*, 8 P.3d at 461; *Carrillo*, 974 P.2d at 485. This high standard of review is justified because such determinations often turn on assessments of the potential juror's demeanor, credibility, and sincerity. *Harlan*, 8 P.3d at 461; *Morrison*, 19 P.3d at 672. The trial court is in a unique position to assess these qualities. *Harlan*, 8 P.3d at 461. Further, this standard of review is intended to "discourage an appellate court from second-guessing those judgments based on a cold record." *Carrillo*, 974 P.2d at 486. We defer to the trial court's rulings on challenges for cause even in capital cases, where our review of the sentence is uniquely extensive. *Harlan*, 8 P.3d at 461. In capital cases, however, we will only affirm the trial court's ruling on a challenge for cause if there is affirmative support in the record for it. *Id.* at 462.

 We find plenty of affirmative support in the record for the trial court's denial of Dunlap's challenge for cause. At the beginning of the voir dire the trial court questioned Juror C about his ability to consider the penalty phase evidence and apply the

four-step analysis required under Colorado law:

THE COURT: [D]o you believe that if the jury found the Defendant guilty of first degree murder, that you would automatically vote for a death sentence in this case?

JUROR C: I think it would depend upon the guidelines. I think I could follow the guidelines. I don't have any predisposition one way or another.

. . . .

THE COURT: Now, the first question is could you decide based on the evidence presented whether one or more aggravating factors existed as a juror?

JUROR C: I think so.

. . . .

THE COURT: If you did that, could you consider whether any one or more mitigating factors exist?

JUROR C: Yes.

THE COURT: The third step requires that—requires if that occurs that the jury as a group weigh and balance the aggravating factors and the mitigating factors to decide based on that whether the aggravating factors outweigh the mitigating factors such that a deathsentence is appropriate or they don't outweigh so a life sentence is appropriate.[31] Do you understand that?

JUROR C: Yes.

THE COURT: Do you think you could do that?

JUROR C: Yes.

THE COURT: The fourth step is even if the jury decides the aggravating factors outweigh the mitigating factors, each juror individually decides whether or not a life sentence should be imposed or whether or not a death sentence should be imposed. It's an individual decision.

. . . .

So the question then arises that given that's the way it works do you believe that you automatically be inclined to say no matter what the evidence is I'm going to vote for a death sentence?

JUROR C: Yes.

THE COURT: You would no matter what?

JUROR C: Uh, if the aggravating factors outweighed the mitigating factors?

THE COURT: Let me back off.

JUROR C: I guess maybe I'm not quite understanding it.

THE COURT: I'm not asking it very well. You start the sentencing phase and you haven't heard a thing.

JUROR C: Right.

THE COURT: Right then and there would you be automatically inclined to vote for a death sentence?

JUROR C: No. No.

THE COURT: Would you be automatically inclined to vote for a life sentence?

JUROR C: At that point, no.

(R. Vol. 60, 101–04) (emphasis added). The court then allowed defense counsel to question Juror C:

DEFENSE COUNSEL: There are people who believe that if they had found beyond a reasonable doubt that someone had committed a deliberative, premeditated, really horrible murder, that they should get the death penalty, period. Are you one of those people?

. . . .

---

**31.** Dunlap argues that this description of the third step was incorrect, thus violating his due process rights and the Eighth Amendment's prohibition on cruel and unusual punishment. The trial court's statement that the jury "as a group" weighs and balances the aggravating and mitigating factors was incorrect. *See People v. Tenneson*, 788 P.2d 786, 791 (Colo.1990) ("The determination whether any mitigating factors outweigh the statutory aggravating factors, therefore, requires *each juror* to make a judgment ....") (emphasis added). However, the trial court went on to correctly state that the decision, during the fourth step of deliberations, of whether to impose the death penalty was an individual decision. More importantly, it is the jury instructions given at the end of the case that control, not the statements made by the trial court during voir dire. *Davis I*, 794 P.2d at 207 ("The in-chambers questioning of a member of the venire is not to be equated with the charging of the jury. The purpose of the *voir dire* was not to instruct the jurors on the law of the state but to determine whether the juror could impartially and conscientiously apply the law as laid out by the court in its instructions."). Dunlap's claim is without merit.

JUROR C: I can't say that one way or another. I probably made statements to that effect. But, you know, I'm reasonably open minded and it would behoove someone to convince me otherwise, I guess.
. . . .

DEFENSE COUNSEL: Okay. Starting from there would you be able to honestly and fairly consider and weigh mitigating factors that would tend in the mind of some people to justify a life sentence? . . .

JUROR C: I think so.
. . . .

DEFENSE COUNSEL: Okay. Could you consider things like his age as a potential mitigating factor?
. . . .

JUROR C: Yes, they can be considered. I don't have a problem with that.

DEFENSE COUNSEL: Okay. Do you believe that starting as you do from the proposition that when someone commits a deliberative knowing murder of another human being that they should die, do you think that that belief would prevent or in some way substantially impair your ability to fairly and honestly consider mitigating facts about that?

JUROR C: No, I don't think so. I don't think it would impair me.
. . . .

DEFENSE COUNSEL: Okay. What thoughts went through your mind on Friday when the judge started talking about the possibility of the death penalty and started telling you about the process, the steps that jury [sic] would have to go through, what were you thinking at that time?

JUROR C: I had no particular thoughts one way or the other. *Like I said, I don't have any real* predisposition one way or the other regarding that.

DEFENSE COUNSEL: Okay.

JUROR C: I'm not adamantly opposed. I'm not adamantly for it.

(R. Vol. 60, 106–09) (emphasis added). Finally, the trial court allowed the prosecutor to question Juror C:

THE PROSECUTOR: Now, on the death penalty issue it sounds like you are sort of down the middle on this; is that correct?

JUROR C: That's correct.

THE PROSECUTOR: You understand that if the Defendant is found guilty of first degree murder, the prosecution still has to prove beyond a reasonable doubt that the death penalty is the appropriate sentence in this case to your satisfaction?

JUROR C: Yes.
. . . .

THE PROSECUTOR: I understand. So you would wait before you make a decision until after you have heard the evidence in the penalty phase; is that correct?

JUROR C: Yes.

(R. Vol. 60, 111–12) (emphasis added).

The underlined portions of the above passages provide ample record support for the trial court's denial of Dunlap's challenge for cause. Juror C consistently stated that he would not make a decision about the appropriate penalty until all of the evidence had been heard. He also stated that, while he thought the death penalty is appropriate in a first-degree murder case, he was open-minded and would consider all the evidence. The trial court did not err in denying Dunlap's challenge for cause of Juror C. *See People v. Young,* 16 P.3d 821, 825–26 (Colo.2001).

## 2. Ineffective Assistance of Counsel— Failure to Exhaust

 We next address whether trial counsel's failure to exhaust all of Dunlap's peremptory challenges was ineffective assistance of counsel, and hold that it was not.

The 35(c) hearing revealed that Lewis and Gayle disagreed over whether the peremptory challenges should be exhausted. Gayle wanted to exhaust the defense's peremptory challenges by striking the last alternate juror until all the challenges were used, in order to preserve all possible appellate issues. As lead counsel, however, Lewis made the ultimate decision to accept the jury panel prior to exhausting peremptory challenges. Lewis explained this decision at the 35(c) hearing:

At that point we had achieved a jury panel that I felt we could accept and *there were a number of jurors coming up in the order of jurors who I felt were unacceptable to us* and who I felt the prosecution would probably like to get on this jury

and so under the system that we were operating under ... we knew who was next up in order as opposed to a random draw ... and *we reached a point where I realized in just counting people that I could take mathematical control of this process, but to do that I had to stop exercising challenges so that I had more than the prosecution and I did ...* and so as the prosecution in this case kept exercising challenges, we had more than the prosecution did, so ... we had the last word....

(R. Vol. LXI, 173–74) (emphasis added).

Lewis' testimony reveals that his decision to accept the jury was a strategic choice entitled to deference. *See, e.g., Stevens v. State,* 770 N.E.2d 739, 751 (Ind.2002) (failure to exhaust peremptory challenges out of fear that the jurors coming up were worse than those on the jury was not ineffective assistance of counsel); *People v. Lucas,* 12 Cal.4th 415, 48 Cal.Rptr.2d 525, 907 P.2d 373, 415 (1995) (rejecting ineffectiveness claim based on the failure to exhaust peremptory challenges because "the decision whether to accept a jury as constituted is obviously tactical"). Lewis knew which prospective jurors were next in line and determined that they were unacceptable to the defense. Therefore, he accepted the jury as constituted [32] to ensure he would be able to strike anyone the People might later add. Such strategy was not deficient performance; Dunlap has failed to prove his ineffective assistance of counsel claim.

### B. The People's Challenges for Cause

Dunlap next alleges that the trial court erroneously granted ten of the People's challenges for cause. Dunlap claims that his rights to trial by an impartial jury and due process were violated as well as the prohibition on cruel and unusual punishment. As explained previously, the trial court is afforded broad discretion in ruling on challenges

for cause, and we will only overturn those rulings if there was an abuse of discretion. *Davis I,* 794 P.2d at 204; *People v. Drake,* 748 P.2d 1237, 1243 (Colo.1988). We are not convinced that the trial court abused its discretion in granting the People's challenges for cause.

Before examining the individual challenges, we can dispense with Dunlap's overarching claims. Dunlap first argues that the trial court erroneously instructed several jurors that the law mandated imposition of the death penalty if aggravation outweighed mitigation. While Dunlap is correct that this is an inaccurate statement of Colorado law, *Davis I,* 794 P.2d at 207, the portions of the record that Dunlap points to do not support his claim. The trial court informed the prospective jurors that, if at the third step of deliberations the jurors concluded mitigation did not outweigh aggravation, a death sentence would be appropriate (not mandated) and the jury would move to the fourth step. The trial court then instructed that at the fourth step each individual juror made a decision as to whether life or death was the appropriate sentence. This was an accurate statement of Colorado's law. *See People v. Tenneson,* 788 P.2d 786, 789 (Colo.1990) (describing Colorado's four-step deliberative process in capital cases). We do not see in the record where the trial court told prospective jurors that they were required to return the death penalty, as Dunlap claims.

Even if the trial court told a prospective juror the law would require the death penalty, we have previously held that doing so during individual voir dire is not reversible error. *Davis I,* 794 P.2d at 207. As we stated in *Davis I:*

[A]lthough the court's hypothetical question did not accurately convey the law of Colorado, we believe it was an appropriate device for ascertaining whether the juror

---

**32.** Dunlap also argues that trial counsel was ineffective for not using a peremptory challenge on Juror C and the three alternate jurors for whom the trial court had denied the defense's causal challenges. The People asked Lewis at the 35(c) hearing why he did not strike jurors in the general voir dire who he had challenged during individual voir dire. Lewis testified that the defense team was continuously reevaluating the jury pool throughout the lengthy voir dire

process. The team's assessment of a juror, particularly in comparison to the other possible jurors, changed as the proceedings went on. We will not second guess these strategic decisions based on a cold appellate record. *See People v. Hinton,* 37 Cal.4th 839, 38 Cal.Rptr.3d 149, 126 P.3d 981, 999 (2006) (rejecting defendant's ineffective assistance of counsel claim because the use of peremptory challenges is inherently subjective and intuitive).

was inalterably opposed to capital punishment. If, as [the juror] indicated, he was unwilling to return a sentence of death when the law absolutely required him to do so, then the lesser proposition, that he was unwilling to return a death sentence, where under the law it was appropriate but not required, is obviously true. The in-chambers questioning of a member of the venire is not to be equated with the charging of the jury. The purpose of the *voir dire* was not to instruct the jurors on the law of the state but to determine whether the juror could impartially and conscientiously apply the law as laid out by the court in its instructions.

*Id.*

■ Dunlap next complains, somewhat paradoxically, that the trial court told prospective jurors they had an "absolute right" to return a life sentence and that the law would never require the imposition of the death penalty. Dunlap argues that those jurors who responded they would always return a life sentence were in compliance with the law and should not have been struck under *Witt.* This argument is not persuasive. Even in a capital case, a defendant is not "entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor." *Witt*, 469 U.S. at 423, 105 S.Ct. 844. Therefore, the State may challenge for cause those jurors whose views of capital punishment would substantially impair their ability to fairly consider the death penalty as a sentencing option. *See id.; Drake*, 748 P.2d at 1245. As we explained in *Drake:*

> Far from being impermissible, exclusion of prospective jurors solely on the basis that they are unable under any circumstances to impose the death penalty serves the state's legitimate interest in having a single jury that can consider the facts impartially and conscientiously apply the law in

the case at both the guilt-innocence and sentencing phases of a capital trial.
*Drake*, 748 P.2d at 1245.

■ Having dispensed with Dunlap's overarching claims of error, we look to whether the trial court wrongly struck for cause the ten prospective jurors that Dunlap challenges. We find that there is ample affirmative support in the record for the trial court's decision to strike nine of the ten prospective jurors. A juror by juror analysis of these nine would unnecessarily lengthen this opinion and therefore we do not engage in one here. While we also find that there is affirmative support in the record for the trial court's excusal of the tenth juror, Juror M, his excusal raises a closer question. We therefore examine his voir dire in greater depth.

Juror M was excused because the trial court found his views on the death penalty substantially impaired his ability to be an impartial juror.[33] During voir dire Juror M expressed that while he thought the death penalty could be appropriate in "extreme" cases, a person would have to be "completely evil, 100 percent" before he could vote for the death penalty in the final stage of deliberations. When asked by both defense counsel and the prosecutor whether he could fairly consider both the death penalty and life imprisonment, Juror M consistently said that it would be "very difficult" for him to vote for the death penalty and he would probably vote for life imprisonment if he could see "any good in a person at all."

Whether Juror M should have been excused for cause is a close question. While Juror M stated it would be "very difficult" to vote for the death penalty, he did not state that he could never do it. Nonetheless, we find sufficient support for the trial court's ruling in Juror M's statements that he would vote for life imprisonment if any mitigation

---

**33.** At the time of Juror M's excusal, the trial court stated he was excused for "publicity." As Dunlap correctly points out, the People only objected to Juror M on hardship and death penalty grounds. The court's statement that Juror M was excused for publicity, however, appears to have been nothing more than a slip of the tongue. The voir dire of Juror M concentrated heavily on his views of the death penalty. In addition, when the defense again objected to Juror M's dismissal a few days later, the court reviewed its notes and stated Juror M was dismissed because he was substantially impaired. The record as a whole therefore makes clear that the trial court was concerned with Juror M's death penalty views when it excused him for cause.

existed, however slight. In *Davis* I, we upheld dismissal of a prospective juror who stated that if there was any evidence the defendant drank alcohol, the juror would not be able to vote for the death penalty. 794 P.2d at 207. In affirming the juror's dismissal we stated:

> [A]lthough the juror may properly consider all relevant mitigating evidence and may determine what weight to give such evidence, the juror is still required to follow the requirements of our statute and weigh the aggravating circumstances against the mitigating circumstances. *For a prospective juror to state that in any case involving the use of alcohol, no matter how little, the juror will not return a death sentence, is to admit that such juror would not follow the law of this state.*

*Id.* (emphasis added).

Similarly in this case, Juror M's statements that he would vote for a life sentence if any mitigation existed, however slight, shows that he was substantially impaired in his ability to fairly and impartially weigh the aggravating and mitigating evidence. In reaching this decision, we also take into account the trial court's ability to assess Juror M's credibility, demeanor, and sincerity. Whether a juror will be substantially impaired rarely appears with clarity in the printed appellate record, and for this reason we defer to the trial judge's assessments of credibility. *Witt*, 469 U.S. at 424–26, 105 S.Ct. 844; *Davis I*, 794 P.2d at 205–06. "We are in no position, on appellate review of a cold record, to judge which of a juror's inconsistent or equivocal answers rings the most

true; it is for the trial judge to perform such evaluation." *Davis I*, 794 P.2d at 206.

## V. Jury Instructions and Juror Misconduct

Dunlap raises a number of objections to the jury instructions. Dunlap also alleges that juror misconduct during deliberations violated his rights to trial by an impartial jury and due process. We reject Dunlap's claims.

### A. Guilt Phase Jury Instructions

Dunlap first argues that jury instruction no. 1 violated the rule in *Adams v. Texas* by instructing the jurors that, when determining whether Dunlap was guilty of the crimes charged, they were not to consider the issue of punishment. In *Adams*, the Supreme Court held that the defendant's right to a fair trial by impartial jury was violated because the trial court struck for cause all jurors who stated that the possible imposition of the death penalty might "affect" them. 448 U.S. 38, 50–51, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). *Adams* does not stand for the proposition that jurors should consider punishment issues when deliberating on guilt. Dunlap's claim is without merit.

Dunlap next argues that jury instructions 2 and 13 violated the rule that a defendant can only be convicted of one count of first-degree murder for a single victim.[34] *See People v. Lowe*, 660 P.2d 1261 (Colo.1983); *People v. Bartowsheski*, 661 P.2d 235 (Colo. 1983). For each of the four murder victims, the jury found Dunlap guilty of both first-

---

**34.** Jury instruction no. 2 stated:

The defendant, NATHAN JERARD DUNLAP, is charged with committing the crimes of MURDER IN THE FIRST DEGREE—AFTER DELIBERATION which includes the crime of MURDER IN THE SECOND DEGREE AND MURDER IN THE FIRST DEGREE—FELONY MURDER (four counts); CRIMINAL ATTEMPT TO COMMIT MURDER IN THE FIRST DEGREE—AFTER DELIBERATION, which includes the crime of CRIMINAL ATTEMPT TO COMMIT MURDER IN THE SECOND DEGREE and CRIMINAL ATTEMPT TO COMMIT MURDER IN THE FIRST DEGREE—FELONY MURDER; FIRST DEGREE BURGLARY; ASSAULT IN THE FIRST DEGREE; AGGRAVATED ROBBERY; and THEFT with a value of four hundred dollars or

more but less than fifteen thousand dollars, in Arapahoe County, Colorado, on or about DECEMBER 14, 1993. The Defendant has pleaded not guilty.

Jury instruction no. 13 stated:

In this case, a separate offense is charged against the defendant in each count of the information. Each count charges a separate and distinct offense, and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count. The fact that you may find the defendant guilty or not guilty of one of the offenses charged should not control your verdict as to any other offense charged against the defendant.

The defendant may be found guilty or not guilty of any one or all of the offenses charged.

degree felony murder and first-degree murder after deliberation.—[35] Dunlap argues that these dual guilty verdicts violated *Lowe* and *Bartowsheski*. Dunlap further argues that upon being found guilty of felony murder he could not also be convicted of the predicate felonies, first-degree burglary and aggravated robbery. Dunlap argues that jury instructions 2 and 13 led to these legally improper convictions. He maintains that at sentencing the jury relied on the improper convictions as non-statutory aggravating circumstances, violating due process and cruel and unusual punishment, and thus the death penalty must be set aside. We disagree.

Dunlap is correct that he cannot be convicted and sentenced to both first-degree murder after deliberation and felony murder for the death of a single victim. *Lowe*, 660 P.2d at 1270–71. In this case, however, the trial judge entered only one conviction for each murder victim—first-degree murder after deliberation—and therefore complied with *Lowe*.[36] Because only convictions for first-degree murder after deliberation were entered, the trial court did not err in also entering convictions for first-degree burglary and aggravated robbery. *Bartowsheski*, 661 P.2d at 246–47. We therefore reject Dunlap's claim that the jury relied on improper convictions when imposing the death penalty. The jury was instructed at the penalty phase that: 1) the first-degree murder after deliberation and first-degree felony murder verdicts merged

into a single conviction for each victim, and 2) they were only to sentence Dunlap on the first-degree murder after deliberation convictions. We presume the jury understood and followed the trial court's instructions. *Dunlap I*, 975 P.2d at 748. Dunlap's claim fails.[37]

### B. Penalty Phase Jury Instructions

Dunlap argues that three of the jury instructions given during the penalty phase violated his rights to due process, trial by jury, and the cruel and unusual punishment clauses, as well as statutes and case law. Specifically, Dunlap complains that the instructions regarding the third and fourth steps of the deliberative process failed to instruct the jurors on the "presumption of life," failed to place the burden of proof on the People, and erroneously instructed that before a life sentence could be returned the jury had to be "convinced" that life was "appropriate." The trial court's instructions to the jury at the penalty phase correctly stated the law and therefore Dunlap's claims fail.

In order to impose the death penalty in Colorado, the jury must go through a four-step deliberative process. *Tenneson*, 788 P.2d at 789, 791–92. The first step is to determine whether the prosecution has proven at least one statutory aggravating factor beyond a reasonable doubt. *Id.* If the jury unanimously determines the prosecution has

---

**35.** The jury also found Dunlap guilty of attempted first-degree murder after deliberation, attempted first-degree felony murder, first-degree burglary, first-degree assault, aggravated robbery, and theft.

**36.** Similarly, the trial court only entered one conviction for attempted first-degree murder. Dunlap contends that the death penalty must be set aside because the jury found him guilty of attempted first-degree felony murder, which the court of appeals has subsequently ruled is not a cognizable offense. *People v. Stephenson*, 30 P.3d 715, 717 (Colo.App.2000); *People v. Meyer*, 952 P.2d 774, 775–76 (Colo.App.1997). We find no merit in Dunlap's argument. The jury deliberated on and found Dunlap guilty of both attempted first-degree murder after deliberation and attempted first-degree felony murder. The trial court properly merged the guilty verdicts into a single, valid conviction for attempted first-degree murder and thus no improper conviction

exists. Furthermore, the charges arose because Dunlap shot a fifth victim, Bobby Stephens, in the face. These facts, independent of the guilty verdicts, supported the statutory aggravator of knowingly creating a grave risk of death to another during the commission of an offense, which the jury found proven beyond a reasonable doubt. There is simply nothing but speculation to support Dunlap's assertion that the jury's sentencing decision was based on improper considerations.

**37.** To the extent Dunlap asserts the trial court should not have even allowed the jury to deliberate on both first-degree murder after deliberation and first-degree felony murder, the argument is meritless. *Lowe*, 660 P.2d at 1271 ("The prosecution should be allowed to charge multiple theories of first-degree murder in separate counts.... If there is sufficient evidence in the record, all theories charged should be submitted to the jury for a special verdict.").

proven at least one statutory aggravator beyond a reasonable doubt, the jury goes to step two and considers whether any mitigating factors exist. *Id.* There is no burden of proof on either party at this stage. *Id.* At the third stage of deliberations each juror must weigh the mitigating factors and the statutory aggravating factors. If the jury unanimously determines beyond a reasonable doubt that the mitigation does not outweigh the aggravation, it moves to the fourth and final step. *Id.* At the fourth step, the jury must decide whether to impose a life or death sentence. *Id.* The purpose of the four-step process is to ensure the reliability of a death verdict. *Id.* at 792.

■ The jury instructions in this case correctly described the required four-step process and Dunlap's claims thus fail. First, contrary to Dunlap's argument, there is no presumption of life imprisonment in Colorado. *Tenneson,* 788 P.2d at 797. In *Tenneson* we determined that, given the facts of that case, the trial court did not abuse its discretion in instructing the jury on a presumption of life. *Id.* at 797–98. However, we also specifically stated that such language is ill-advised, that the "better practice" is to avoid such an instruction, and that the statute makes no mention of a presumption of life. *Id.* Dunlap's arguments that the instructions in this case were erroneous because they did not instruct the jury on a presumption of life are therefore without merit.

Second, Dunlap's argument that the instructions failed to impose a burden of proof on the prosecution at the third and fourth steps is completely meritless. We fully analyzed this exact issue in a previous case, where we explained that the "beyond a reasonable doubt" standard at the third and fourth steps refers to a standard imposed on the jury, not a burden placed on either party. *People v. White,* 870 P.2d 424, 455–56 (Colo. 1994). The phrase "beyond a reasonable doubt" as used in this context simply conveys the level of certainty the jury must possess before returning a death sentence. *Id.; Tenneson,* 788 P.2d at 794, 796. Contrary to Dunlap's assertions, *White* did not create new law but explained and reaffirmed *Tenneson.* We therefore do not address Dunlap's

argument concerning retroactive application of *White.*

Finally, the instructions were not erroneous because they stated that the jury should impose a life sentence if convinced that life was the appropriate penalty. Instruction no. 14 stated in relevant part:

> The fourth step in your deliberations is to decide whether the defendant should be sentenced to death or life imprisonment. If one or more jurors finds that life imprisonment is the appropriate penalty, then the

result is a sentence of life imprisonment. If you unanimously agree that the prosecution has convinced you beyond a reasonable doubt that the death penalty is the appropriate punishment, the result is a sentence of death.

> Instruction no. 24 similarly provided, in pertinent part:

> Before imposing a death sentence, you must unanimously be convinced beyond a reasonable doubt that death is the appropriate penalty for the defendant. This involves a process in which you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or requires the imposition of the death penalty, in light of the totality of circumstances present.

> . . . .

> If you are not unanimously convinced that death is the appropriate penalty, the sentence must be life imprisonment.

> Regardless of the findings you have made in steps one, two, and three, you do not have to return a verdict of death. There is never a requirement that you must impose a death sentence in any situation. Your deliberations in this final step can lead to one of the three following results:

> A) If all jurors are unanimously convinced, beyond a reasonable doubt, that death is the appropriate punishment in this case, then you shall return a verdict imposing a sentence of death.

> B) If all jurors are unanimously convinced that life imprisonment is the appropriate punishment in this case, then you

shall return a verdict imposing a sentence of life imprisonment.

C) If all jurors cannot unanimously agree upon the appropriate punishment, then the foreperson of the jury shall so indicate on the verdict forms as directed by the Court. The Court will then impose a sentence of life imprisonment without the possibility of parole.

Reading these jury instructions as a whole, the trial court correctly instructed the jury. The instructions repeatedly stated that a death sentence could only be returned if the jury unanimously agreed beyond a reasonable doubt that death was the appropriate penalty. Furthermore, the jury was instructed that it never had to return the death penalty. Dunlap's claims are without merit.

## C. Statutory Aggravating Factors

Dunlap claims the trial court sua sponte instructed the jury on six statutory aggravating factors not alleged by the prosecution, thus violating his due process rights to notice and an impartial judge and to protection against cruel and unusual punishment. This contention is wholly without merit.

The verdict forms submitted to the jury contained seven statutory aggravating factors for each of the four murder victims, for a total of twenty-eight statutory aggravators. Prior to trial the People submitted an "Initial List of Aggravating Factors" to Dunlap and the trial court. The statutory aggravators of: 1) prior felony conviction and 2) knowingly creating a grave risk of death to another, namely Bobby Stephens, were included in the list. These aggravators, however, were only listed once as opposed to once for each of the murder victims. Because the trial court submitted these aggravators for each of the victims at trial, Dunlap argues the trial court sua sponte introduced aggravators not alleged by the prosecution. Dunlap's argument is not convincing. The People's disclosure was sufficient to put Dunlap on notice that the People intended to allege and introduce evidence of these two aggravators. Dunlap was not denied due process.

## D. Juror Misconduct

Dunlap next argues that his rights to due process and to a fair trial by an impartial jury were violated when the trial judge failed to question the jury in response to allegations of juror misconduct. We assume, without deciding, that the trial court erred in not questioning the jurors. Applying the harmless beyond a reasonable doubt standard, we hold that Dunlap suffered no prejudice from the trial court's failure to question the jurors.

On the first morning of the penalty phase, it came to the trial court's attention that one of the alternate jurors, Alternate Juror S, was experiencing extreme emotional distress over continuing to serve on the jury. The trial court was further informed that another alternate, Alternate Juror P, had told Alternate Juror S about Dunlap's conviction and sentence for the robbery of a Burger King.[38] The trial court conducted an individual voir dire of all the alternates. In so doing, it was discovered that while the alternates were waiting in a private room for the jury's verdict, a few of the alternates had discussed the Burger King conviction. The trial court also learned that when the regular jurors and the alternates were reunited after the guilty verdicts were returned, at least one of the alternates congratulated the regular jurors on the verdicts and stated that she wished she could have deliberated with them.

Defense counsel moved for dismissal of all of the alternate jurors, a mistrial, and questioning of the regular jurors to determine whether they had been exposed to prejudicial, extraneous information from the alternates. The trial court dismissed Alternate Jurors S and P from further service, but denied the motions to dismiss the rest of the alternates and for mistrial. The trial court also declined to interview the regular jurors regarding their exposure to information about the Burger King robbery or to the alternate's comments following the guilty verdicts. Dunlap now argues that the trial court's refusal to question the jury or provide Dunlap with other relief[39] violated due pro-

---

**38.** The Burger King conviction and sentence were not admitted into evidence during the guilt phase of the trial. During the penalty phase, the jury heard evidence about the conviction but not the length of Dunlap's sentence.

**39.** A mistrial is a drastic remedy. *People v. Gladney*, 194 Colo. 68, 74, 570 P.2d 231, 235 (1977). We review the denial of a mistrial for an abuse of discretion. *Id.* We find the trial court did not abuse its discretion in denying the motion for a

cess and his right to a fair trial by impartial jury, as well as our decision in *Harper v. People*, 817 P.2d 77 (Colo.1991).

A criminal defendant is entitled to have the jury reach a verdict based solely on the evidence presented in the courtroom. *See, e.g., Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Butters v. Wann*, 147 Colo. 352, 358, 363 P.2d 494, 497 (1961). The constitutional right to a fair trial is therefore implicated when a jury is exposed to extraneous information. *Butters*, 147 Colo. at 358, 363 P.2d at 497; *see generally People v. Boulies*, 690 P.2d 1253 (Colo. 1984) (constitutional right to jury trial violated where alternate juror present during deliberations). In *Harper v. People*, we articulated the test for determining when a trial court should question a jury regarding possible exposure to mid-trial media publicity. We adopted a three-step process for dealing with publicity during trial: 1) the trial court must determine whether the publicity is inherently prejudicial; 2) if so, the court should canvass the jury to determine whether the jury learned of the prejudicial publicity; and 3) the trial court should individually examine exposed jurors to determine how much they know of the publicity and what effect, if any, the publicity will have on their deliberations. *Harper*, 817 P.2d at 83; *People v. Harrison*, 58 P.3d 1103, 1109–10 (Colo.App.2002), *abrogated on other grounds by People v. Johnson*, 121 P.3d 285, 288 (Colo.App.2005). Failure to poll the jury in response to prejudicial publicity can be an abuse of discretion, particularly where the evidence against the defendant is weak or equivocal. *See Harper*, 817 P.2d at 83–86; *see also United States v. Thompson*, 908 F.2d 648, 650 (10th Cir.1990) (applying abuse of discretion standard); *People v. Ferrero*, 874 P.2d 468, 473 (Colo.App. 1993) (same).

The 35(c) court determined that the trial court should have canvassed the regular jurors to determine whether they were exposed to any extraneous, prejudicial information. The 35(c) court further determined, however, that the error was harmless beyond a reasonable doubt. We assume, without deciding, that the trial court abused its discretion in not questioning the jury.[40] We agree with the 35(c) court, however, that Dunlap could not have been prejudiced by this error and therefore is not entitled to postconviction relief.

We apply the harmless beyond a reasonable doubt standard to the trial court's failure to question the jury because Dunlap made a timely request that it do so. *People v. Miller*, 113 P.3d 743, 749 (Colo.2005); *see also Thompson*, 908 F.2d at 652–53 (applying harmless error analysis to trial court's failure to question jury about exposure to a prejudicial newspaper article). Under this standard, a trial error requires reversal unless the reviewing court determines that the error was harmless beyond a reasonable doubt. *Blecha v. People*, 962 P.2d 931, 942 (Colo. 1998). "[I]f there is a reasonable probability that [the defendant] could have been prejudiced by the error, the error cannot be harmless." *Id.*

We conclude that the trial court's failure to question the jury was harmless beyond a reasonable doubt. The alternates' conversation about the Burger King conviction occurred while the regular jurors were deliberating in a separate room on the guilty verdicts. Nothing in the record indicates that the regular jurors were exposed to information regarding the Burger King conviction or sentence; thus, there is no reasonable probability that Dunlap was prejudiced during the guilt phase of trial.[41]

---

mistrial, nor did it abuse its discretion in denying the motion to dismiss all the alternates. The record shows that the trial court dismissed the two most problematic alternate jurors and then kept the alternates separate from the jurors for the remainder of the trial. This remedy was adequate and was within the court's discretion.

**40.** We also assume, without deciding, that *Harper* applies. Some divisions of the court of appeals have applied *Harper* when the trial court learns during trial that the jury was exposed to any type of extraneous information. *See, e.g.,*

*Harrison*, 58 P.3d at 1109–10; *Ferrero*, 874 P.2d at 473. In at least one case, however, the court of appeals held that *Harper* is limited to mid-trial media reports. *People v. Raehal*, 971 P.2d 256, 259–60 (Colo.App.1998).

**41.** Even assuming arguendo that one or more of the deliberating jurors knew of the conviction and sentence during the guilt phase, the overwhelming evidence of Dunlap's guilt convinces us that there was no prejudice. *See Dunlap I*, 975 P.2d at 765.

During the penalty phase, furthermore, evidence of the conviction was admitted to prove the statutory aggravating factor of a prior felony conviction. We are therefore convinced that the trial court's failure to question the jurors about their exposure to information about the Burger King conviction was harmless beyond a reasonable doubt.

There is also no reasonable probability that Dunlap was prejudiced by the alternate juror's statements to the regular jurors about the guilty verdicts. The incident occurred after the guilty verdicts were announced, and therefore could not have had any impact on the jury during the guilt phase. Given the overwhelming aggravation presented by the People during the penalty phase, moreover, we are convinced beyond a reasonable doubt that the alternate's comments had no prejudicial impact on the jury's decision to impose the death penalty. *See Matthews v. State*, 45 P.3d 907, 913 (Okla. Crim.App.2002) (alternate juror's praising a regular juror for returning a guilty verdict did not impact the decision to impose the death penalty).

In sum, assuming that the trial court erred by not questioning the jurors on their possible exposure to extraneous influences, we are convinced that the error was harmless beyond a reasonable doubt. Dunlap is not entitled to postconviction relief.

## VI. Miscellaneous Issues

Dunlap raises a number of other miscellaneous issues, none of which merit postconviction relief.

### A. Constitutionality of Colorado's Capital Sentencing Scheme

Dunlap alleges that Colorado's capital sentencing scheme violates the federal and state due process and cruel and unusual punishment clauses. Dunlap argues that Colorado's sentencing scheme does not sufficiently narrow the class of persons who are eligible for the death penalty because the jurors individually determine whether mitigation exists and, if so, whether or not it outweighs the statutory aggravators found to exist.

■ Because the death penalty is qualitatively different from any other punishment under the law, the United States Supreme Court requires heightened reliability in capital cases. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 884–85, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Tenneson*, 788 P.2d at 791. To pass constitutional scrutiny, a capital sentencing scheme must direct and limit the discretion of the sentencer to ensure the death penalty is not imposed in an arbitrary and capricious manner. *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Tenneson*, 788 P.2d at 790. The eligibility phase of a capital sentencing scheme must genuinely narrow the class of persons eligible to receive the death penalty. *Tenneson*, 788 P.2d at 790. In Colorado, the class of persons eligible to receive the death penalty is narrowed by requiring the jury find the existence of one statutory aggravating factor beyond a reasonable doubt. *Id.* at 791. The jury then considers the existence of any mitigating factors and must determine whether mitigation outweighs aggravation. *Id.* If the jury is convinced beyond a reasonable doubt that mitigation does not outweigh aggravation, the defendant is eligible to receive the death penalty and the jury moves to the final selection stage of deliberations. *Id.* at 791–92.

■ We see no constitutional infirmity in Colorado's capital sentencing scheme. By requiring that the jury find both that a statutory aggravator has been proven beyond a reasonable doubt and that mitigation does not outweigh aggravation before a defendant is even eligible to receive the death penalty, Colorado's sentencing scheme is sufficiently reliable to pass constitutional muster. *See Dunlap I*, 975 P.2d at 735 ("This court has previously upheld the constitutionality of the death penalty in Colorado under a prior version of the statute at issue."); *Rodriguez V*, 914 P.2d at 250 ("Our decisions [have] upheld the constitutionality of section 16–11–103 and rejected the argument that the death penalty violates the Cruel and Unusual Punishment and Due Process Clauses of the United States and the Colorado Constitutions."). We reject Dunlap's argument that the jury has too much discretion to determine whether mitigation exists and, if so, the weight to apply to the mitigating evidence. *Davis I*, 794 P.2d at 172 (rejecting an argument that

Colorado's death penalty statute is unconstitutional because it affords the jury too much discretion); *cf. Zant,* 462 U.S. at 875, 103 S.Ct. 2733 ("[T] he Court [in *Gregg]* approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances."). Dunlap's claim thus fails.

### B. "Prior Conviction" Statutory Aggravator

At the penalty phase, the prosecution presented evidence on the statutory aggravating factor that Dunlap had been "previously convicted in this state of a class 1 or 2 felony involving violence," and the jury found it proven beyond a reasonable doubt for each of the four murder victims. Dunlap argues there was insufficient evidence to support the aggravator because the conviction was not entered until January 1996, after the Chuck E. Cheese murders occurred. We addressed and disposed of this issue in *People v. White,* where we held "that 'previous convictions' incorporates convictions existing at the time a sentencing hearing is conducted ... regardless of the date on which the offense underlying the 'previous conviction' occurred." 870 P.2d at 442. Because Dunlap's felony conviction was entered before the Chuck E. Cheese sentencing hearing began, his claim fails.[42]

### C. Polygraph Examination Evidence

Dunlap next contends that the trial court violated his constitutional rights by prohibiting him from impeaching one of the People's witnesses, Carl Wilson, with the results of Wilson's polygraph examination. Wilson's plea bargain was conditioned on successfully passing a polygraph test, which Wilson failed to do. Dunlap argues he was entitled to tell the jury that Wilson had not passed a polygraph examination and yet was being given the benefit of the plea bargain.

▮▮▮▮ Dunlap's claim is essentially identical to an issue raised and disposed of on direct appeal. *Dunlap I,* 975 P.2d at 755. "[Dunlap] cannot use a proceeding under Rule 35 to relitigate matters fully and finally resolved in an earlier appeal." *Rodriguez V,* 914 P.2d at 249. To get around this rule, Dunlap argues that his current claim is "broader and constitutionally-based." We fail to see any difference between the current claim and the issue litigated on direct appeal. Even if the claims are slightly different, "an argument raised under Rule 35 which does not precisely duplicate an issue raised on appeal will be precluded if its review would be nothing more than a second appeal addressing the same issues on some recently contrived constitutional theory." *Id.* (internal quotation omitted). In *Dunlap I,* we made clear that polygraph evidence is per se inadmissible in criminal proceedings, 975 P.2d at 755–57, and we will not revisit that holding here.

### VII. The 35(c) Hearing

Dunlap's final set of issues concerns alleged errors that occurred during the 35(c) hearing.

### A. Dunlap's Medical Records

Dunlap claims that the prosecutors should have been disqualified from the 35(c) proceedings under section 20–1–107, C.R.S., because the district attorney's office allegedly committed theft of Dunlap's medical records in violation of section 18–4–412, C.R.S.[43] The medical record at issue is an April 2000 report of Dr. John Stoner, a psychologist with the Department of Corrections ("DOC"). After conducting an evidentiary hearing, the 35(c) court found that a knowing receipt of medical records under section 18–4–412 had not been shown,[44] and therefore declined to

---

42. The prosecution introduced a redacted mittimus and the testimony of a district attorney investigator to establish the prior felony conviction. This evidence is sufficient to support the jury verdict.

43. Dunlap also alleges the 35(c) court should have suppressed the medical records and/or vacated the death penalty. Because we hold that the 35(c) court did not abuse its discretion in

how it handled and resolved this issue, we do not discuss Dunlap's other requested forms of relief.

44. Section 18–4–412, C.R.S. (2006) provides in relevant part:

Any person who, without proper authorization, knowingly obtains a medical record or medical information with the intent to appropriate the medical record or medical information to his own use or to the use of another, who steals or discloses to an unauthorized person a medical

award Dunlap's requested relief. The 35(c) court did rule, however, that it would draw an adverse inference against Dr. Stoner's report and testimony.

The statute providing for the disqualification of a district attorney provides in relevant part:

A district attorney may only be disqualified in a particular case at the request of the district attorney or upon a showing that the district attorney has a personal or financial interest or finds special circumstances that would render it unlikely that the defendant would receive a fair trial.

§ 20–1–107(2), C.R.S. (2006).[45] The 35(c) court treated the motion as one for disqualification based on "special circumstances that would render it unlikely that the defendant would receive a fair trial," because the defense agreed there were no personal or financial interests involved. In his briefing to this court, Dunlap argues the motion to disqualify should have been granted because of an "appearance of impropriety" and because the "theft" of the medical records created a conflict of interest that made it impossible for the district attorney's office to treat him fairly. The 2002 amendments to section 20–1–107(2), which apply in this case, eliminated "appearance of impropriety" as a basis for disqualification. *People v. N.R.*, 139 P.3d 671, 675 (Colo.2006). This leaves the allegation of a conflict of interest, which could only fall under the "special circumstances" basis for disqualification.

The 35(c) court found the following facts. A district attorney and an investigator traveled to the Colorado State Penitentiary on October 8, 2002, after having received thousands of pages of discovery from the defense, in order to meet with Dr. Stoner. In the course of discussing another expert's report on Dunlap's mental health it came to light that Dr. Stoner had conducted tests on Dunlap as well. The district attorney was not aware of Dr. Stoner's test. Dr. Stoner proceeded to check with other DOC personnel, who informed Dr. Stoner that the defense

had already been provided with his report as a result of Dunlap's signed release. Dr. Stoner photocopied and gave the report to the district attorney, who turned the report over to the defense the next day in discovery. It then came to light that the DOC had not in fact previously given the defense the report.

The 35(c) court's findings make clear that in its opinion the DOC was at fault for failing to provide the defense with the report, as it should have done, and then for releasing the report to the prosecution out of an erroneous belief the report had already been provided to the defense. The 35(c) court determined the district attorneys did not violate the theft of medical records statute and declined to disqualify them. The 35(c) court believed, however, that some remedy was appropriate in response to the situation. Finding Dr. Stoner's testimony to be biased and not credible, the court stated that it would draw an adverse inference against his testimony and report when ruling on the 35(c) motion.

We review a lower court's decision regarding whether to disqualify a district attorney for an abuse of discretion. *N.R.*, 139 P.3d at 678 (finding the trial court abused its discretion in disqualifying the district attorney); *People v. Palomo*, 31 P.3d 879, 882 (Colo.2001) ("Trial courts have broad discretion in determining whether they should disqualify a district attorney from prosecuting a particular case."). We will find an abuse of discretion only where the lower court's decision was manifestly arbitrary, unreasonable, or unfair. *Palomo*, 31 P.3d at 882.

We hold that the 35(c) court did not abuse its discretion in this case. In cases interpreting both the current and prior versions of section 20–1–107(2), we have stressed that in determining whether to disqualify a district attorney the trial court should focus on whether the defendant will receive a fair trial. *See N.R.*, 139 P.3d at 677 (listing cases); *People v. C.V.*, 64 P.3d 272,

---

record or medical information, or who, without authority, makes or causes to be made a copy of a medical record or medical information commits theft of a medical record or medical information.

**45.** We cite to the most recent Colorado Revised Statutes because the General Assembly has not amended the statute subsequent to October 2002, when the alleged prosecutorial misconduct occurred.

275–76 (Colo.2003); *Palomo*, 31 P.3d at 882. In addition, the language of the statute states that special circumstances justify disqualification where the circumstances "would render it unlikely that the defendant would receive a fair trial." § 20–1–107(2). There is nothing in the record to indicate that Dunlap did not receive a fair 35(c) hearing. His argument that the conduct of the district attorney's office proves it could not treat him fairly is simply not supported by the record. The 35(c) court's resolution of the issue was adequate,[46] and there was no abuse of discretion. *See Palomo*, 31 P.3d at 885 ("Courts should impose the least severe sanctions necessary....").

## B. Testimony of CMHIP Staff and Arapahoe County Jail Staff

Dunlap raises a series of claims that the 35(c) court erred during the postconviction hearing by admitting and considering certain testimony.

### 1. Fifth Amendment Claims

Dunlap objects to the testimony of members of the CMHIP staff and the Arapahoe County Jail staff. The witnesses at issue testified to their observations of Dunlap before and during Dunlap's 1994 competency evaluation at CMHIP, their opinions of Dunlap's mental health, and statements made by Dunlap. Dunlap alleges that consideration of this testimony when Dunlap had not received constitutionally adequate warnings under *Miranda v. Arizona* violated due process and his Fifth Amendment privilege against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Dunlap further argues that the opinions of these witnesses were based in part on

his statements and thus should also have been excluded as fruits of the illegally obtained statements. Because the 35(c) court relied on the statements and opinions in ruling Dunlap was not prejudiced by trial counsel's failure to investigate and present mental health mitigation, Dunlap asks that the prejudice finding be reversed and the death penalty vacated.[47]

Dunlap relies heavily on the United States Supreme Court's opinion in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In *Estelle*, the Supreme Court ruled that the defendant's Fifth Amendment rights were violated when the psychiatrist who conducted the defendant's pre-trial competency examination testified for the State during the capital penalty phase as to defendant's future dangerousness, based upon defendant's statements regarding the crime. 451 U.S. at 464–69, 101 S.Ct. 1866. Prior to undergoing the competency examination, defendant was not warned under *Miranda* that he had a right to remain silent and that anything he said could be used against him. *Id.* at 466–69, 101 S.Ct. 1866. Dunlap argues that *Estelle* controls here.

Dunlap's reliance on *Estelle* is misplaced.[48] *Estelle's* holding is limited to situations where the defendant "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence...." *Id.* at 468, 101 S.Ct. 1866; *Penry v. Johnson*, 532 U.S. 782, 794, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). The Supreme Court has made clear the narrowness of its holding in *Estelle*:

[I]f a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from

---

46. Dunlap argues that the 35(c) court ended up relying upon Dr. Stoner's report in ruling on the 35(c) motion, despite the court's promise not to do so. This is wholly unsupported by the record, as the 35(c) court's order only mentions Dr. Stoner's report in passing.

47. This issue is arguably mooted by our reversing the 35(c) court's holding on the performance prong. *See* Section III.A.3, *supra*. Nonetheless, we address Dunlap's claim that the 35(c) court erred in admitting this evidence because we relied in part upon the CMHIP evidence to hold that trial counsel's decision was not deficient performance.

48. In *Estelle* the Supreme Court determined whether a violation of the Fifth Amendment occurs when evidence from a court-ordered competency exam is put before a capital sentencing jury in the absence of *Miranda* warnings. In this case, the jury did not hear any of the evidence Dunlap finds objectionable. Dunlap offers no authority, nor have we found any, to establish that *Estelle* extends to a postconviction hearing where the defendant has alleged ineffective assistance of counsel. We need not deal with this question, however, because Dunlap's Fifth Amendment rights were not violated even under *Estelle*, as explained in the text.

the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Buchanan v. Kentucky,* 483 U.S. 402, 422–23, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). We have likewise recognized that when a defendant places his mental capacity at issue the prosecution may rebut the defense with psychological evidence, even if that evidence includes defendant's statements not taken in compliance with *Miranda.*[49] *People v. Branch,* 805 P.2d 1075, 1083 & n. 4 (Colo. 1991).[50] Numerous other courts have also held that where the defendant places his mental health at issue, the prosecution may rebut the defendant's evidence with evidence derived from a court-ordered examination without running afoul of the Fifth Amendment. *See, e.g., Wilkes v. United States,* 631 A.2d 880, 889 (D.C.App.1993); *Isley v. Dugger,* 877 F.2d 47, 49–50 (11th Cir.1989); *Schneider v. Lynaugh,* 835 F.2d 570, 575–77 (5th Cir.1988); *Watters v. Hubbard,* 725 F.2d 381, 383–86 (6th Cir.1984).

Assuming without deciding that the requirements of *Miranda* were not met for at least some of the evidence admitted in this case, Dunlap's claim nonetheless fails. The *Buchanan* line of cases, not *Estelle,* controls Dunlap's claim. At the 35(c) hearing Dunlap raised the mental health issue by arguing that trial counsel should have further investigated and presented mental health mitigation evidence during the penalty phase of trial. Dunlap's experts at the 35(c) hearing, particularly Dr. Barkhorn, arrived at their diagnoses and conclusions by relying at least in part on CMHIP records. Under these circumstances, Dunlap's Fifth Amendment rights were not violated by the People rebutting Dunlap's contention with the testimony of those doctors, hospital staff, and jail staff that had contact with Dunlap immediately prior to and during his mental health examination.[51]

## 2. Section 16–8–107, C.R.S.

In a related argument, Dunlap also claims that admission of the CMHIP staff's testimony was error under section 16–8–107, C.R.S. This section provides, in pertinent part:

[N]o evidence acquired directly or indirectly ... from a communication derived from the defendant's mental processes during the course of a court-ordered examination ... is admissible against the defendant on the issues raised by a plea of not guilty, if the defendant is put to trial on those issues....

§ 16–8–107(1), C.R.S. (2006).[52] This statute only prevents the admission of such evidence during the guilt phase of a trial, and does not speak at all to the penalty phase or a postconviction proceeding. *See People v. Hernandez,* 768 P.2d 755, 757 (Colo.App.1988).[53] Dunlap's claim is without merit.

## C. Lay Opinion Testimony

 Finally, Dunlap argues that the 35(c) court erred in admitting CMHIP staff members' opinions about Dunlap's mental health, because none of the witnesses were certified as expert witnesses. The 35(c)

**49.** The statements, however, must be otherwise voluntary to be admissible. *People v. Branch,* 805 P.2d 1075, 1083 & n. 4 (Colo.1991).

**50.** We have held that a defendant's voluntary statements taken in violation of *Miranda* may only be used by the prosecution to impeach the testimony of the defendant if he testifies, and not to impeach the testimony of any other defense witness or to generally rebut a defense theory. *People v. Trujillo,* 49 P.3d 316 (Colo.2002). In *Trujillo,* however, we recognized that an exception to this rule occurs when the defendant has raised a mental health defense. *Id.* at 325. *Trujillo* thus does not alter our conclusion in this case.

**51.** We further note that the trial court held a pretrial suppression hearing on at least some of the same testimony at issue here. The trial court ruled Dunlap's statements were voluntary and therefore the People could use them to rebut a mental health defense at the penalty phase. The record supports this holding.

**52.** Dunlap does not explain in his brief which version of section 16–8–107 should control his claim—that in effect at the time of trial or at the time of the 35(c) hearing. We cite to the most recent version of the statute because the quoted portion was the same under either version.

**53.** The version of the statute in effect at the time of the 35(c) hearing explicitly allowed such evidence to be admitted in a capital sentencing hearing to "prove the existence or absence of any mitigating factor." § 16–8–107(1)(b), C.R.S. (2001).

court declined to certify the witnesses as experts because the People had not timely designated them. The 35(c) court nonetheless allowed the witnesses to describe their 1994 observations of Dunlap and to offer their opinions of his mental health at that time based on those observations. The court admitted the testimony as lay opinion testimony, and also ruled that the opinions were admissible under section 16–8–109, C.R.S. We hold that some of the opinions offered by the CMHIP staff were expert opinions improperly admitted under the guise of lay opinion testimony. We conclude, however, that the error was harmless.

We review a lower court's rulings on evidentiary issues for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). The 35(c) court allowed the witnesses to opine about Dunlap's mental health under Colorado Rule of Evidence 701 and section 16–8–109, C.R.S. Rule 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

CRE 701 (2006).[54]

Section 16–8–109, C.R.S., specifically allows lay opinion testimony about a defendant's mental condition:

> In *any trial or hearing* in which the mental condition of the defendant is an issue, *witnesses not specially trained in psychiatry or psychology may testify* as to their observation of the defendant's actions and conduct, and as to conversations which they have had with him bearing upon his mental condition, and they *shall be permitted to give their opinions or conclusions concerning the mental condition of the defendant.*

§ 16–8–109, C.R.S. (2006) (emphasis added); *see also, People v. Giles*, 192 Colo. 240, 248, 557 P.2d 408, 414 (1976) ("Subject to the proper foundation, a psychiatric social worker may give opinion testimony on a defendant's mental condition.").

After reviewing the transcript of the 35(c) hearing, we conclude that the 35(c) court abused its discretion in admitting some of the "lay" opinions. Most of the CMHIP staff's testimony was admissible under CRE 701 and section 16–8–109. For example, the witnesses' descriptions and observations of Dunlap's behavior were admissible. The witnesses' opinions that were not based on specialized knowledge or training were also admissible under the statute and rule. We hold, however, that the witnesses' testimony about the symptoms of a specific mental illness and opinions whether Dunlap suffered from a specific illness were impermissible expert testimony.

An example of impermissible expert opinion testimony admitted under the guise of lay opinion can be found in the testimony of Kay Salas, a registered nurse working at CMHIP in 1994:

> PROSECUTOR: Let me ask you something, because you have had experience with treating and caring for patients who you knew to be diagnosed as bipolar, correct?
>
> WITNESS: Yes.
>
> PROSECUTOR: Is that a disorder that tends to be cyclical; that is, there would be periods of time in which the person is—
>
> WITNESS: Yes.
>
> PROSECUTOR: —having problems and then periods where the problems appear to be less?
>
> WITNESS: Yes.
>
> . . . .
>
> PROSECUTOR: As to Mr. Dunlap, did you consider the possibility in forming your own opinions that perhaps these were cycles in a bipolar disorder?
>
> WITNESS: Yes, yes, I did.
>
> PROSECUTOR: And what did you—
>
> WITNESS: All right. This is my opinion, but I felt like that he did display some behaviors that were really consistent with bipolar disorder, but what he also dis-

---

**54.** We cite to the most recent edition of the Colorado Rules of Evidence because the text of the rules has not changed since the 35(c) hearing.

played, along with those, gibberish, the—the incontinence of urine and feces, the smearing of food and stuff like that you just don't generally see with a bipolar disorder.

PROSECUTOR: What do you expect to see that with? WITNESS: Psychosis.

PROSECUTOR: Did you consider that he might be having a psychotic episode?

WITNESS: Yes, I thought that—especially when he first came in, that was what I really thought. I thought that he was psychotic.

PROSECUTOR: What caused you to think that these behaviors were volitional instead of psychotic?

WITNESS: Because a person who is psychotic, if they're severely enough psychotic to the point that they're incontinent of urine and feces and not feeding themselves and not keeping their clothes on, if they're that severely psychotic, they don't turn that on and off. That doesn't change within a day or two or within a shift.

(R. Vol. XLIV, 212–14.) This testimony clearly relies upon the witness' specialized knowledge and training, and therefore goes beyond the bounds of lay opinion under CRE 701. Rather, this testimony falls into the category of expert opinion testimony under CRE 702.[55] *See Stewart*, 55 P.3d at 124 ("[W]e hold that where . . . an officer's testimony is based not only on her perceptions and observations . . ., but also on her specialized training or education, she must be properly qualified as an expert before offering testimony that amounts to expert testimony.").

Furthermore, although section 16–8–109 permits lay opinion testimony regarding a defendant's "mental condition," we do not believe the statute allows a lay witness to opine as to a defendant's specific diagnosis. Under the statute, a witness without training in psychiatry or psychology who has observed the defendant's actions and conduct may give an opinion about the defendant's mental condition. § 16–8–109. Colorado courts have applied the statute to the admission of a lay witness' opinion of the defendant's sanity—i.e., the defendant's ability to understand right from wrong [56]—and the defendant's future dangerousness if released. *See Giles*, 192 Colo. at 247–48, 557 P.2d at 413–14; *People v. Medina*, 185 Colo. 101, 104–05, 521 P.2d 1257, 1259 (1974); *People v. Osborn*, 42 Colo.App. 376, 380, 599 P.2d 937, 940 (1979). Neither the case law nor the plain language of the statute, however, allows a lay witness to offer diagnoses that could only be considered expert opinions under the rules of evidence.

Although we hold that the 35(c) court abused its discretion in admitting certain expert opinions under the guise of lay opinion, we find the error to be harmless. "In the context of a bench trial, the prejudicial effect of improperly admitted evidence is generally presumed innocuous." *Liggett v. People*, 135 P.3d 725, 733 (Colo.2006). The court's judgment will only be disturbed if "it is clear that the court could not have reached the result but for the incompetent evidence." *Id.* (internal quotation omitted).

First, ample evidence in addition to the staff's improperly admitted opinions supported the 35(c) court's finding that Dunlap was not prejudiced from trial counsel's decision to not present or investigate a mental health defense.[57] *See* Discussion, section III. A.4, *supra*. Second, we stress again the narrowness of our ruling—the only testimony that was improperly admitted was the wit-

---

**55.** Compare Ms. Salas' opinion elicited earlier in direct examination, which did not link the behavior to a specific diagnosis and thus was permissible under CRE 701:

PROSECUTOR: [W]hat caused you to change your mind and believe [Dunlap's actions] were volitional?

WITNESS: The behaviors were inconsistent and he—he displayed the strange assortment of behaviors and—and they were inconsistently displayed. I came to feel that he had some control over what he did and when.

(R. Vol. XLIV, 196–97.)

**56.** *See* § 16–8–101, C.R.S. (2006) (insanity defined).

**57.** With regard to the *Strickland* prejudice prong, the 35(c) court specifically stated that it found no prejudice because "the State's aggravating evidence, [sic] was substantial and overwhelming." The 35(c) court listed nine specific factors leading to its finding of no prejudice. Of the nine factors, only two even referenced evidence from CMHIP.

nesses' opinions as to the specific mental illness from which Dunlap either did or did not suffer. The witnesses' observations of Dunlap's behavior and those opinions which did not require specialized training or knowledge were properly admitted and considered by the 35(c) court. Third, the 35(c) court stated numerous times that it would consider the testimony as lay opinion only, and would not apply an "expert gloss" to the CMHIP staff's opinions. Moreover, because we reverse the 35(c) court's performance prong ruling, Dunlap's ineffective assistance of counsel claim fails regardless of what evidence the 35(c) court considered in ruling on the prejudice prong. For these reasons, the 35(c) court's error was harmless.

## VIII. Conclusion

In sum, we hold that Dunlap did not receive ineffective assistance of counsel at either the guilt or penalty phase of his trial for the Chuck E. Cheese murders. We also hold that Dunlap's other claims of constitutional error are without merit and therefore we deny postconviction relief. We reverse the 35(c) court's findings of deficient performance, but affirm the remainder of its findings. Finally, the errors that the 35(c) court made during the evidentiary hearing were harmless and therefore no relief is granted. We dissolve the stay of execution and remand this case back to the trial court to set a date for imposition of the death sentence.

Justice EID does not participate.